EDWIN D. DAVIS, PETITIONER *v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT

EDWIN D. DAVIS AND SANDRA W. DAVIS, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 8665-71, 8666-71.    Filed September 11, 1975.

*Kenneth G. Anderson* and *James D. O'Donnell,* for the
petitioners.
*Donald W. Williamson, Jr.,* for the respondent.

GOFFE, *Judge:* The Commissioner determined deficiencies in
Federal income taxes as follows:

| Petitioner | Year | Docket No. | Deficiency |
|---|---|---|---|
| Edwin D. Davis | 1967 | 8665–71 | $39,676.24 |
| Edwin D. Davis and Sandra W. Davis | 1966 | 8666–71 | 36,167.78 |

The cases have been consolidated for trial, briefs, and opinion.
The parties have settled certain adjustments made in the
statutory notices of deficiency. The issue remaining for decision
is whether the taxable income of Clinical Orthopaedic X-Ray,
Inc., and Medical Center Therapy, Inc., should be attributed to
petitioner Edwin D. Davis, M.D., pursuant to section 61, section
482, or both, or alternatively, whether the corporate income
should be allocated to Dr. Davis pursuant to section 1375(c).[1]

---

[1] All section references are to the Internal Revenue Code of 1954, as amended, applicable
to the years before the Court.

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts, supplemental stipulations of facts, and attached exhibits are incorporated by this reference.

Edwin D. Davis and Sandra W. Davis, hereinafter petitioners, were married during the taxable year 1966 and filed a joint Federal income tax return for 1966 with the District Director of Internal Revenue, Jacksonville, Fla. The petitioners were not married during the taxable year 1967 and petitioner Edwin D. Davis filed a separate Federal income tax return for 1967 with the District Director of Internal Revenue, Jacksonville, Fla. Petitioners were remarried in 1968 and resided in Daytona Beach, Fla., at the time of the filing of their petitions.

Petitioner is a medical doctor specializing in orthopedic surgery, including the diagnosis, correction, and/or prevention of skeletal deformities and the examination, diagnosis, and treatment of diseases and injuries of bones, joints, and soft tissue adjacent to the bones and joints.

Dr. Davis came to Daytona Beach, Fla., in 1958 and has continuously carried on his medical practice in that locale. Initially, X-ray and physical therapy facilities were not personally made available by Dr. Davis to his patients and he would refer his patients, in the case of needed physical therapy, to unrelated third parties or institutions. In the case of X-rays, he would refer his patients to the office of a radiologist who conducted a practice in the same building. Upon Dr. Davis' instruction, his nurse would direct the patient to the radiologist's office with written instructions, whereupon the radiologist's technician would then take the X-rays, develop the films, and send the films back to the doctor's office where they were interpreted by Dr. Davis. Sometime prior to 1961, the radiologist informed petitioner that his X-ray facilities were overloaded due to the use demanded in servicing petitioner's patients. An X-ray machine and other equipment were then acquired by petitioner and located in the same building where he conducted his practice. About a year before he established his own X-ray facility, Dr. Davis established a physical therapy facility to provide the modernized treatment which he considered necessary for adequate therapeutic treatment, although local therapy institutions considered such modern equipment unnecessary. He

employed a physical therapist and assistants to operate the physical therapy facility.

In December 1961 and January 1962, the X-ray facilities and physical therapy facilities were incorporated under the laws of the State of Florida under the respective names of Clinical Orthopaedic X-Ray, Inc. (hereinafter X-Ray), and Medical Center Therapy, Inc. (hereinafter Therapy). The incorporation of the facilities was accomplished on the advice of petitioner's accountant and attorney after petitioner's request for a solution to various personal and business problems. Specifically, petitioner became aware of his potential liability occurring through the use of inherently dangerous equipment when a patient was seriously burned by an operator during heat therapy. He was also concerned about the potential for damage to his professional reputation resulting from the negligent acts of his employees. Further concern was caused by the fact that Dr. Davis' first wife died in 1957 which left him with the care of three children, ages 3, 7, and 11 years. The lack of alternative family members to care for the children, the development of a cardiac problem, and re-marriage to a woman much younger than the doctor, coupled with fears that the marriage might end in divorce, which in fact occurred in 1967, prompted concern as to the care and means of support and maintenance for the children in the event of divorce and death. In addition to personal problems, there were personnel and supervisory problems caused by a desire on the part of the technicians in both the X-ray and the therapy facilities to deal, when necessary, directly with the doctor rather than dealing with his office manager. Consequently, in order to prevent dissension and to establish more autonomous groups as between the X-ray facility, therapy facility, and his private medical practice, he concluded that it would be helpful if the facilities could be reorganized and further separated by the use of the corporate form. Dr. Davis received complaints from physicians who referred patients to Dr. Davis concerning the amount of his fees which was caused by the failure of the patients to understand that his fees included fees charged for X-rays and physical therapy treatments. Therefore, he felt that the referring physicians would be better informed if separate billings were provided. He recognized, however, that the same results could have been accomplished by using a single statement which split the fees between medical, X-ray, and therapy services. This latter

method of billing was adopted in November 1966 and one of the reasons for changing to a separate itemized statement was to satisfy the requirements of reimbursing insurance companies.

X-Ray and Therapy were both authorized to issue 50 shares of no-par capital stock. The authorized stock of the two corporations was issued on January 1 and January 10, 1962, respectively, in the names of Dr. Davis (48 shares) and two nominees, Don R. Warren and French C. Davis as subscribers (1 share each), who served as incorporators with petitioner. On the same dates, the stock of the latter two subscribers was canceled and Dr. Davis, on the advice of his attorney, made gifts of 30 percent of the stock in each of the two corporations to each of his three minor children. Since the date of the gifts and throughout the period involved herein, the stock of the two corporations has been owned as follows:

| Shareholder | Therapy | X-Ray |
|---|---|---|
| Edwin D. Davis (taxpayer) | 5 shares | 5 shares |
| Diana Lee Davis (daughter) | 15 shares | 15 shares |
| Barbara Lynn Davis (daughter) | 15 shares | 15 shares |
| Edwin D. Davis II (son) | 15 shares | 15 shares |
| Total | 50 shares | 50 shares |

Petitioner's attorney also recommended the establishment of a formal guardianship for the stock that was transferred to the three children. The guardianship was formed by order of the county judge for the State of Florida, County of Volusia, dated June 17, 1965, and the delay in formation was caused by reason of litigation concerning who should be the proper guardian. Petitioner was president of both corporations since their inception through the taxable years in question.

On January 29, 1962, both corporations filed elections to be taxed as small business corporations under subchapter S of the Internal Revenue Code. Each corporation filed Federal income tax returns for the taxable years 1966 and 1967 with the District Director of Internal Revenue, Jacksonville, Fla., and the stockholders reported their allocable share of the income as follows:

THERAPY

| Shareholder | 1966 | 1967 |
|---|---|---|
| Edwin D. Davis (taxpayer) | $1,900.63 | $2,319.90 |
| Diana Lee Davis (daughter) | 5,701.90 | 6,959.73 |
| Barbara Lynn Davis (daughter) | 5,701.90 | 6,959.74 |
| Edwin D. Davis II (son) | 5,701.90 | 6,959.74 |
| Total | 19,006.33 | 23,199.11 |

X-RAY

| Shareholder | 1966 | 1967 |
|---|---|---|
| Edwin D. Davis (taxpayer) | $4,379.82 | $3,969.04 |
| Diana Lee Davis (daughter) | 13,139.41 | 11,907.13 |
| Barbara Lynn Davis (daughter) | 13,139.41 | 11,907.13 |
| Edwin D. Davis II (son) | 13,139.41 | 11,907.13 |
| Total | 43,798.05 | 39,690.43 |

The amounts allocated to the children were distributed to the children, net of the income tax attributable thereto, and placed in savings accounts pursuant to the guardianship proceeding. No expenditures were made of these funds by or for Dr. Davis or to discharge any of his legal obligations.

Since incorporation and through the taxable years in question, Therapy has employed a registered physical therapist and two aides; owned various types of therapy equipment; owned separate patient records; maintained its own accounting records including journals and ledgers in which entries were posted by employees of a certified public accountant employed and compensated by Therapy; utilized its own bank account; paid its own operating expenses including rent, salaries, utilities, taxes, supplies, and equipment repairs; and filed its own payroll tax return and other returns. Since incorporation and through the taxable years in question, X-Ray has employed a registered X-ray technician; owned or leased all of its equipment except an X-ray machine discussed below; owned its own patient records; maintained files of X-ray films produced over the years; maintained its own accounting records including journals and ledgers in which entries were posted by employees of a certified public accountant employed and compensated by X-Ray; utilized its own bank account; paid its own operating expenses, including rent, salaries, utilities, taxes, supplies, and equipment repairs. In October 1965, Dr. Davis moved the offices of his private medical practice, and the offices of X-Ray and Therapy into a building constructed and owned by Dr. Davis. At the time of the move, Dr. Davis purchased a new X-ray machine for which Dr. Davis personally executed a 7-percent note for about $20,000. Dr. Davis deducted depreciation on the X-ray machine for 1966 and 1967 on his personal Federal income tax return. The machine was registered with the Florida State Board of Health in the name of X-Ray for 1966 although prior and subsequent registrations are

inconsistent in their designation of either X-Ray as registrant or petitioner.

X-Ray and Therapy each paid annual rent of $1,800 in 1966 and $3,600 annual rent in 1967, all to Dr. Davis as lessor. The fair rental value of the space was determined to be $3 per square foot which was comparable to the prior rental paid by the corporations to an unrelated third party. There was no formal rental agreement between petitioner as lessor of the space and X-Ray or Therapy, as lessees.

The business conducted by Therapy involved the adminis-tration of physical therapy treatments based on a prescription written by the referring physician who, in most instances, was Dr. Davis. Although there were occasions when Dr. Davis would refer patients to other therapists, such outside referral was due to geographic restrictions in the mobility of the patient and was generally not the case. The fees charged by Therapy were based on a fee schedule (other than as to workmen's compensation patients whose fees were set by Florida statute), which took into consideration the nature and type of treatment. The fee schedule was approved by Dr. Davis as president of Therapy upon the suggestion and/or recommendation of the physical therapist employed by Therapy who was aware of the fees generally imposed in the community by reason of her membership in various professional societies. There was no disparity in fees charged by Therapy and those charged in the community and patients referred to Therapy by physicians other than Dr. Davis were charged exactly the same fees as the patients of Dr. Davis. After the initial referral, a patient would generally return to Therapy for numerous treatments prior to a reexamination by the referring physician. No charge was made by Dr. Davis for his medical services unless he actually saw the patient and then the determination of his fee was wholly unrelated to physical therapy considerations. Dr. Davis never administered or assisted in the administration of physical therapy treatments other than rendering the required prescription and Dr. Davis never came into the therapy facility in connection with the treatment of a patient.

The business conducted by X-Ray involved the making of X-ray films for use and diagnosis by the referring physician which in most instances was Dr. Davis. Dr. Davis applied his training and experience in interpreting the X-ray film in diagnosing his

patient's injury. The technician employed by X-Ray was not trained or qualified to read or interpret X-ray film. The fees charged by X-Ray were generally based on the size of the film, the difficulty of the procedure, and the time required to develop the film. A fee schedule, approved by Dr. Davis as president of X-Ray, dictated the charges and the amounts charged were comparable to those charged by other X-ray facilities in the community. The fees charged by Dr. Davis in his medical practice included a charge for reading X-ray films when required but were otherwise unrelated to whether an X-ray was or was not required. Not all of Dr. Davis' patients requiring X-rays were referred to X-Ray. Accident victims and patients examined at the local hospital were usually X-rayed there. Other than delineating the "views" required in his order, Dr. Davis did not train, instruct, assist, or supervise the X-ray technician and he never personally operated X-Ray's equipment except in a few rare emergencies occurring on weekends.

The X-ray technician employed by X-Ray was certified as a technician by a hospital upon completing 2 years of study and training. However, the State of Florida did not require certification or licensing to operate X-ray equipment but the Department of Health and Rehabilitative Services Division of Health of the State of Florida had regulations in effect for the years in question. Chapter 10D-56 of the regulations for the control of radiation hazards at section .03(2) provided:

It is unlawful and prohibited to intentionally apply or allow, directly or indirectly, the application of, radiation to human beings except by or on the order of persons licensed to practice the healing arts and authorized to use radiation.

The regulation was amended in 1969 and 1972 to read as follows in order to reflect the manner in which it was understood by the community and applied by the Division of Health under the regulations in effect during 1966 and 1967:

It is unlawful and prohibited to intentionally apply or allow, directly or indirectly, the application of radiation to human beings except by or under the supervision of persons licensed to practice the healing arts and authorized to use radiation.

NOTE: Supervision in this subsection shall mean the responsibility for, and control of, quality, radiation safety, and technical aspects of the applications of radiation to human beings for diagnostic and therapeutic purposes. This prohibition shall not be deemed to apply to persons who are occupationally

exposed to radiation or otherwise provided in these regulations. [Ch. 10D- 56.105(2).]

Since the incorporation of Therapy and X-Ray and during the years in question, Dr. Davis did not personally render any direct services to either of the corporations other than serving as their president and a member of their boards of directors, signing checks, hiring the employees of each corporation, of which there were no changes during the years in question, assisting in the setting of fees upon consultation with the X-ray technician or physical therapist, in which there were no changes during the years in question, and in the handling of infrequent and limited administrative problems. These activities required 4 to 5 hours per year in the case of X-Ray and 15 hours a year in the case of Therapy.

Although each corporation maintained separate billing and accounting records, the office manager employed by petitioner in his private practice prepared the corporate checks for Dr. Davis' signature without recompense from the corporations. Prior to November 1966, separate employees of X-Ray, Therapy, and petitioner's private practice were responsible for and did all their own billing and bookkeeping for charges resulting from treatment rendered by each entity, posted all payments received to individual patient ledger cards, and prepared and made deposits to separate bank accounts. After November 1966, the procedures for billing, collecting, and depositing fees were partially changed to result in a centralized procedure. The billing of the three entities with respect to nonlitigation patients, which represented about half of the total patients, was aggregated on one itemized statement, the final preparation of which was accomplished by petitioner's office manager without recompense from the corporations. The billing procedures for litigation patients remained within the control of each entity.[2] Also in November 1966, all collections were deposited in a special escrow account from which funds were allocated and transferred monthly to the separate bank accounts of each of the two corporations and petitioner's medical practice. Funds deposited in the special escrow account and the separate corporate bank accounts were never borrowed, used, or diverted, either directly or indirectly for the use or benefit of another entity.

---

[2] Litigation patients were accident victims who were pursuing civil recovery as distinguished from Dr. Davis' private patients referred to as nonlitigation patients.

In his statutory notices of deficiency, the Commissioner, under the authority of sections 61 and 482 and "in order to prevent the evasion of taxes and to clearly reflect income," determined that the "entire amount of the small business corporation income" reported by X-Ray and Therapy was allocable to petitioner. In the alternative, he determined that all such income was allocable to petitioner under the authority of section 1375(c) in order to reflect the value of services rendered by petitioner to the corporations.

OPINION

The petitioner, Dr. Davis, is an orthopedic surgeon who was engaged in a complete medical practice in that specialty. In his diagnostic work he relied upon X-rays made in his office and in cases where treatment was administered, the physical therapy was performed in his office. He organized two corporations, one of which performed the X-ray function and the other carried out physical therapy treatment which he prescribed. He made gifts of 90 percent of the stock of each of the corporations to his three minor children and they and the corporations elected to be taxed as small business corporations under the provisions of subchapter S.

The Commissioner determined that the income of the corporations should be taxed to Dr. Davis under three distinct principles: (1) That under section 61 Dr. Davis attempted to assign the income or "fruit of the tree" when, in reality, Dr. Davis earned the income reported by the corporations; (2) section 482 required allocation of the income from the corporations to Dr. Davis in order to prevent avoidance of tax; and (3) Dr. Davis performed services for the corporations and section 1375(c), therefore, required allocation back to him of the income reported by the corporations.

Respondent has limited the scope of his challenge to the reporting of the income by apparently conceding that X-Ray and Therapy were not "'shams' or 'fictions' in the purest sense." Likewise, respondent concedes that Dr. Davis' transfer of the stock to his children had substance and should, therefore, be recognized. Compare *Henry D. Duarte*, 44 T.C. 193 (1965), *Michael F. Beirne*, 52 T.C. 210 (1969), and sec. 1.1373-1(a)(2), Income Tax Regs., with *Brooke v. United States*, 468 F.2d 1155 (9th Cir. 1972). We are urged, on the authority of *Gregory v.*

*Helvering,* 293 U.S. 465, 470 (1935), *Commissioner v. Court Holding Co.,* 324 U.S. 331, 334 (1945), and *Kimbrell v. Commissioner,* 371 F.2d 897, 902 (5th Cir. 1967), to find that the economic practicalities and substance of the arrangement requires taxation of the income to Dr. Davis rather than to the corporations.

Respondent further submits that the transfer of the X-ray and therapy facilities by Dr. Davis to the corporations followed by his transfer of the stock to his children constituted an anticipatory assignment of a portion of his future income. See, e.g., *Lucas v. Earl,* 281 U.S. 111 (1930); *Helvering v. Clifford,* 309 U.S. 331, 335 (1940); *Commissioner v. Sunnen,* 333 U.S. 591 (1948). Alternatively, respondent advocates an allocation of the entire net taxable income of the corporations to Dr. Davis on the theory that the corporate contributions to the earning of the net taxable income were de minimis as compared to the services rendered by Dr. Davis. In this regard, he relies on the presumption accorded his determination under section 482, *Grenada Industries, Inc.,* 17 T.C. 231 (1951), affd. 202 F.2d 873 (5th Cir. 1953), cert. denied 346 U.S. 819 (1953), and, in the main, upon the inferences that may be drawn from all the circumstances where income is generated by a controlled business activity dependent upon the direction of patients, clients, or consumers from a controlling business activity which is closely related. Respondent also contends that the net taxable income of the corporations should be allocated to Dr. Davis pursuant to section 1375(c) to reflect the value of his services to the corporations.

Respondent does not contend that X-Ray and Therapy were not viable business entities. Instead, respondent relies upon *Gregory v. Helvering,* 293 U.S. 465 (1935), and challenges taxation of the income to the corporations rather than to Dr. Davis on the grounds that his purpose in organizing the corporations was solely tax motivated. The primary reasons given by Dr. Davis for the transfers of the X-ray and physical therapy functions to the corporations and gifts of the stock to his children were as follows:

(1) To provide security for his children in view of his marital difficulties and his personal health problems;

(2) To insulate him personally from damage suits arising from negligent use of the potentially dangerous X-ray and physical therapy equipment; and

(3) To separate the personnel problems into the X-ray and physical therapy functions and away from the personnel problems of his medical practice. Respondent counters with alternative remedies to the concerns of Dr. Davis. He could have made cash gifts to his children; he could have purchased liability insurance to insulate him from liability arising from the negligent use of the X-ray and physical therapy equipment; and he could have issued mandates to resolve the personnel problems.

We do not agree with respondent that Dr. Davis' purposes were tenuous. The transfer of valuable property rights with a known potential to produce income seems a logical reason to establish the corporations and give the stock to his children instead of giving cash which would have to be invested. Using the corporate form to insulate the taxpayer from liability has long been recognized as a valid reason for incorporating. *Sam Siegel*, 45 T.C. 566 (1966). It is especially applicable here because Dr. Davis had recently experienced the possibility of liability caused by serious burns received by a patient who was receiving heat therapy. We find Dr. Davis' explanation of resolving personnel differences by separation of the operations a plausible and satisfactory reason.

Respondent's reliance upon *Kimbrell v. Commissioner, supra,* is unavailing. In that case the corporations merely executed contracts, hired employees, negotiated loans, and collected interest thereon, and filed income tax returns. In the instant case the corporations X-rayed patients and administered physical therapy to patients.

Moreover, a taxpayer is not required to continue one form of business organization which results in the maximum tax on business income. *Polak's Frutal Works, Inc.,* 21 T.C. 953, 974-975 (1954).

Respondent contends that the earnings of the corporations should be taxed to Dr. Davis because he had control over the earning of the profits by performing the services. The facts are otherwise. Dr. Davis prescribed the type of X-ray or X-rays to be made for each patient and he prescribed the physical therapy to be administered. The X-ray prescriptions to the corporation were no different than were those to a radiologist he referred patients to before he owned X-ray equipment or those given to the hospital when he would prescribe X-rays for a patient who was admitted to the emergency room. We see little difference in

prescribing X-rays or physical therapy and prescribing drugs to be compounded by a pharmacist. Dr. Davis' division of his endeavors is not particularly unusual. It is common knowledge that an orthopedic surgeon does not himself normally take X-rays nor does he administer physical therapy. If, on the other hand, Dr. Davis attempted to separate his diagnostic work from his surgery, this would be unusual because a doctor personally performs both of these services for a patient. The income of the corporations was generated by the services of persons employed by the corporations not by the services performed by Dr. Davis. Dr. Davis' direct services to the corporations were minimal. Under section 61, we conclude that the corporations controlled the capacity to produce the income through their employees and they, not Dr. Davis, are taxable on that income. *Ronan State Bank*, 62 T.C. 27 (1974).

Section 482 [3] authorizes the Commissioner to allocate income and other items among related taxpayers in order to clearly reflect income or to prevent evasion of taxes.[4]

In his notices of deficiency the Commissioner allocated the net taxable income of the corporations to Dr. Davis. In his brief the Commissioner contends that the corporate employees were adequately compensated for the services they performed and that he advocates allocation only of the net taxable income of the corporations to Dr. Davis because the corporations' contributions of earning that portion of the income were minimal. This line of reasoning is fallacious. The corporations were paid fees comparable to those charged by other X-ray laboratories and physical therapists in the community and those fees were received by the corporations for the services performed by their employees, not Dr. Davis. Again, the analogy to the pharmacist is

---

[3] SEC. 482. ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAXPAYERS.

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

[4] Petitioner seeks to distinguish management and control by directing our attention to a series of decisions which are concerned with the assignment-of-income question under *Lucas v. Earl*, 281 U.S. 111 (1930). Accordingly, we find those decisions distinguishable. We find the reality of control obvious. Sec. 1.482-1(a)(3) and (4), Income Tax Regs.

appropriate. The X-ray technician, the physical therapist, and the pharmacist all carry out prescriptions made by the doctor. Respondent's blanket characterization of the tasks of the employees of the corporations which include the X-ray technician and the physical therapist as "routine" is not warranted. Both are specialists trained to carry out a doctor's order just as a pharmacist fills a prescription. As pointed out above in our discussion of section 61, the division of Dr. Davis' practice into medical practice, X-ray, and physical therapy is not unusual in that the different endeavors are frequently engaged in by separate persons or entities. It is also not unusual in the respect that X-ray laboratories and physical therapists rely on referrals for their business. Again, we see a close analogy to the better-known relationship of doctor and pharmacist. The entire arrangement was comparable to others in the community except that Dr. Davis was in a position to forward business to the corporations. For example, before he owned X-ray equipment, he referred his patients to a radiologist which did not give him a referral fee in return. The radiologist performed no service for the patient different from what the X-Ray corporation now performs; i.e., in both instances the X-rays were interpreted and acted upon by Dr. Davis. Based on all the evidence we conclude that petitioners have made an adequate showing that the Commissioner abused the discretion granted to him by section 482 in allocating the net taxable income of the corporations to Dr. Davis.

Respondent relies upon *Pauline W. Ach*, 42 T.C. 114 (1964), affd. 358 F.2d 342 (6th Cir. 1966). That case is factually distinguishable. *Ach* involved the transfer of a lucrative dress shop business from one member of a family to a related family-owned corporation which had operated a losing dairy business. The transfer was for a promissory note equal to the book value of the assets of the dress shop business. The income of the dress shop business was absorbed by net operating loss carryovers of the dairy business. We sustained disallowance of the net operating loss carryovers under the provisions of section 269 and we approved allocation under section 482 of 70 percent of the dress business profits to Pauline Ach because that portion was attributable to her services. In the instant case we have found as a fact that the gross income of the corporations was not generated by Dr. Davis but, instead, by the employees of the corporations.

The referrals, because they are not unusual as explained above, do not constitute services rendered by Dr. Davis to the corporations.

Respondent points to the failure of Dr. Davis to charge rent for the first 6 months of 1966, the failure to charge Dr. Davis for use of the X-ray machine, and the failure to share common overhead expenses as indicative that his reallocation was proper. As explained above, we have held the reallocation of the Commissioner to be unreasonable. Respondent has not pleaded in the alternative that the specific items described above should be allocated nor did he request amendment of his pleadings following the trial to conform them to the proof. It is obvious that there is some basis for reallocation of the three items, minimal as they are. We will not voluntarily attempt to make such an allocation at this point because the pleadings never apprised petitioners of that issue in order that they could offer proof of the proper allocation of those specific items. The issue presented at trial was allocation of net taxable income upon the broad concept that Dr. Davis generated the income. The size of these three items in relation to the gross income and other expenses cannot justify allocation of the entire net taxable income to Dr. Davis.

As a final "string to his bow" the Commissioner relies upon section 1375(c)[5] which permits him to allocate from one shareholder in a "Small Business Corporation" (subchapter S corporation) amounts treated as dividends which should be allocated to other shareholders who are members of the shareholder's family to reflect the value of services rendered to the corporation by such shareholders. The purpose of section 1375(c) is to tax each shareholder of a subchapter S corporation on the full value of the income he earns. No deflection of that income is to be permitted through artificial salary or dividend payments. S. Rept. No. 1983, 85th Cong., 2d Sess. (1958), 1958-3 C.B. 1143-1144; *Charles Rocco*, 57 T.C. 826, 831 (1972).

---

[5] SEC. 1375. SPECIAL RULES APPLICABLE TO DISTRIBUTIONS OF ELECTING SMALL BUSINESS CORPORATIONS.

(c) TREATMENT OF FAMILY GROUPS.—Any dividend received by a shareholder from an electing small business corporation (including any amount treated as a dividend under section 1373(b)) may be apportioned or allocated by the Secretary or his delegate between or among shareholders of such corporation who are members of such shareholder's family (as defined in section 704(e)(3)), if he determines that such apportionment or allocation is necessary in order to reflect the value of services rendered to the corporation by such shareholders.

In determining the value of services rendered by a shareholder, consideration shall be given to all the facts and circumstances of the business, including the managerial responsibilities of the shareholder, and the amount that would ordinarily be paid in order to obtain comparable services from a person not having an interest in the corporation. * * * [Sec. 1.1375-3(a), Income Tax Regs.]

The determination is factual and tests applied to ascertain the value of the shareholder's services include "the nature of the services performed, the responsibilities involved, the time spent, the size and complexity of the business, prevailing economic conditions, compensation paid by comparable firms for comparable services, and salary paid to company officers in prior years." *Walter J. Roob*, 50 T.C. 891, 898, 899 (1968).

As in *Charles Rocco, supra* at 832, we need not decide whether section 1375(c) requires petitioner to merely overcome the presumptive correctness of the Commissioner's determination or requires him to prove that the Commissioner abused his discretion (if section 1375(c) provides the Commissioner with the same authority he possesses under section 482) because here we find that petitioners have satisfied both tests.

The Commissioner allocated 100 percent of the net taxable income of the subchapter S corporations to Dr. Davis. The undisputed testimony is that he did not actually spend more than 20 hours per year in direct duties to the corporations, which is minimal.

Respondent would have us consider the referral activities of Dr. Davis as being personal services rendered by him to the corporations. This we will not do. As stated above, one of the tests we enumerated above from *Roob* is compensation paid by comparable firms for comparable services. When Dr. Davis referred X-ray patients to a radiologist before he acquired X-ray equipment, the radiologist did not pay him a fee. The same is true as to referrals to a physical therapist. The fees earned by the corporations were the result of the use of the equipment which they owned and the services of their employees, not as a result of services performed by Dr. Davis for the corporations. Respondent's theory, therefore, fails under the comparability test and our holding under section 1375(c) is consistent with our holdings under section 61 and 482. The Commissioner erred in allocating the net taxable income of the corporations to Dr. Davis under section 1375(c).

Accordingly, we find that none of the net taxable income of X-Ray and Therapy was taxable to petitioners Edwin D. Davis and Sandra W. Davis for the taxable years 1966 and 1967.

*Decisions will be entered under Rule 155.*