ELVIN V. JONES AND DORIS E. JONES, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1063-73.    Filed September 23, 1975.

*Stanley L. Drexler* and *Dale W. Haines,* for the petitioners.
*Charles H. Cowley,* for the respondent.

GOFFE, *Judge:* The Commissioner determined a deficiency in petitioners' income tax for the taxable year 1968 in the amount of $20,609. The only adjustment in the statutory notice of deficiency contested by petitioners is the allocation to them of $50,375 of the net income of Elvin V. Jones, Inc., for its taxable year ended February 28, 1969, under the provisions of sections 61(a) and 482, I.R.C. 1954.[1]

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and exhibits are incorporated by this reference.

Petitioners, husband and wife, filed their joint Federal income tax return for the taxable year 1968 with the Internal Revenue Service. They resided in Denver, Colo., at the time they filed their petition.

Petitioner Elvin V. Jones was appointed as an official court reporter of the Federal District Court for the District of Colorado on June 15, 1964, and continues to serve in that capacity. Throughout the year 1968 he was assigned to Judge Hatfield

---

[1] All Code references are to the Internal Revenue Code of 1954.

Chilson. His duties as court reporter are defined by 28 U.S.C. section 753 (1964).[2] He is at all times under the direction of the

[2] 28 U.S.C. sec. 753. Reporters

(a) Each district court of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands shall appoint one or more court reporters.

The number of reporters shall be determined by the Judicial Conference of the United States.

The qualifications of such reporters shall be determined by standards formulated by the Judicial Conference. Each reporter shall take an oath faithfully to perform the duties of his office.

Each such court, with the approval of the Director of the Administrative Office of the United States Courts, may appoint additional reporters.for temporary service not exceeding three months, when there is more reporting work in the district than can be performed promptly by the authorized number of reporters and the urgency is so great as to render it impracticable to obtain the approval of the Judicial Conference.

If any such court and the Judicial Conference are of the opinion that it is in the public interest that the duties of reporter should be combined with those of any other employee of the court, the Judicial Conference may authorize such a combination and fix the salary for the performance of the duties combined.

(b) One of the reporters appointed for each such court shall attend at each session of the court and at every other proceeding designated by rule or order of the court or by one of the judges, and shall record verbatim by shorthand or by mechanical means which may be augmented by electronic sound recording subject to regulations promulgated by the Judicial Conference: (1) all proceedings in criminal cases had in open court; (2) all proceedings in other cases had in open court unless the parties with the approval of the judge shall agree specifically to the contrary; and (3) such other proceedings as a judge of the court may direct or as may be required by rule or order of court or as may be requested by any party to the proceeding. The Judicial Conference shall prescribe the types of electronic sound recording means which may be used by the reporters.

The reporter shall attach his official certificate to the original shorthand notes or other original records so taken and promptly file them with the clerk who shall preserve them in the public records of the court for not less than ten years. An electronic sound recording of proceedings on arraignment, plea, and sentence in a criminal case, when properly certified by the court reporter, shall be admissible evidence to establish the record of that part of the proceeding.

The reporter shall transcribe and certify all arraignments, pleas, and proceedings in connection with the imposition of sentence in criminal cases unless they have been recorded by electronic sound recording as provided in this subsection and the original records so taken have been certified by him and filed with the clerk as hereinabove provided in this subsection. He shall also transcribe and certify such other parts of the record of proceedings as may be required by rule or order of court. Upon the request of any party to any proceeding which has been so recorded who has agreed to pay the fee therefor, or of a judge of the court, the reporter shall promptly transcribe the original records of the requested parts of the proceedings and attach to the transcript his official certificate, and deliver the same to the party or judge making the request.

The reporter shall promptly deliver to the clerk for the records of the court a certified copy of any transcript so made.

The transcript in any case certified by the reporter shall be deemed prima facie a correct statement of the testimony taken and proceedings had. No transcripts of the proceedings of the court shall be considered as official except those made from the records taken by the reporter.

The original notes or other original records and the copy of the transcript in the office of the clerk shall be open during office hours to inspection by any person without charge.

(c) The reporters shall be subject to the supervision of the appointing court and the Judicial Conference in the performance of their duties, including dealings with parties requesting transcripts.

chief judge of the District Court but on a day-to-day basis he is responsible to the judge to whom he is assigned.

In early 1967, the Supreme Court assigned Judge Chilson an antitrust suit filed against El Paso Natural Gas Co. The suit was of considerable importance and involved numerous parties represented by 55 attorneys. The attorneys requested Mr. Jones to furnish "same day" transcripts of the hearings before Judge Chilson. The hearings on the El Paso Natural Gas Co. case commenced in Salt Lake City. They were moved to Ogden, Utah, for 5 weeks and then to Denver, Colo. In addition to those hearings, Judge Chilson continued to hear in Denver cases pending in the District of Colorado and Mr. Jones covered the various hearings and trial sessions as the court reporter. Because of this workload, Mr. Jones employed additional personnel to assist him in performing his work, including notereaders, typists, and detail personnel to assemble and reproduce copies of the transcripts. In addition, he leased additional office equipment. To cover the additional costs, Mr. Jones found it necessary to borrow $10,000 from a bank in Denver in late 1967.

_____

(d) The Judicial Conference shall prescribe records which shall be maintained and reports which shall be filed by the reporters. Such records shall be inspected and audited in the same manner as the records and accounts of clerks of the district courts, and may include records showing:

(1) the quantity of transcripts prepared;
(2) the fees charged and the fees collected for transcripts;
(3) any expenses incurred by the reporters in connection with transcripts;
(4) the amount of time the reporters are in attendance upon the courts for the purpose of recording proceedings; and
(5) such other information as the Judicial Conference may require.

(e) Each reporter shall receive an annual salary to be fixed from time to time by the Judicial Conference of the United States at not less than $3,000 nor more than $7,630 per annum. All supplies shall be furnished by the reporter at his own expense.

(f) Each reporter may charge and collect fees for transcripts requested by the parties, including the United States, at rates prescribed by the court subject to the approval of the Judicial Conference. He shall not charge a fee for any copy of a transcript delivered to the clerk for the records of court. Fees for transcripts furnished in criminal or habeas corpus proceedings to persons allowed to sue, defend, or appeal in forma pauperis shall be paid by the United States out of money appropriated for that purpose. Fees for transcripts furnished in proceedings brought under section 2255 of this title to persons permitted to sue or appeal in forma pauperis shall be paid by the United States out of money appropriated for that purpose if the trial judge or a circuit judge certifies that the suit or appeal is not frivolous and that the transcript is needed to decide the issue presented by the suit or appeal. Fees for transcripts furnished in other proceedings to persons permitted to appeal in forma pauperis shall also be paid by the United States if the trial judge or a circuit judge certifies that the appeal is not frivolous (but presents a substantial question). The reporter may require any party requesting a transcript to prepay the estimated fee in advance except as to transcripts that are to be paid for by the United States. [Footnote and citations omitted.]

On March 19, 1968, after consultation with his accountants and an attorney, Mr. Jones caused to be organized under the laws of Colorado a corporation named Elvin V. Jones, Inc. The articles of incorporation recited broad business purposes including the purposes to own, operate, maintain and conduct a court reporting, public secretary, and stenographer service, a telephone exchange service, accounting service, bookkeeping service, and billing service. The articles authorized 45,000 shares of no-par or nominal value stock. The corporation issued 1,000 shares of its stock to petitioners as joint tenants for $100 in cash, an automobile, and furniture and fixtures.

The offices of the corporation throughout 1968 were those of Mr. Jones in the Federal courthouse. The corporation opened and operated its own bank account. The corporation billed purchasers of transcripts on its own billhead and it had stationery printed with its name. Mr. Jones submitted the form of the corporation stationery to the Chief Judge of the District of Colorado for approval. The judge directed Mr. Jones to remove from the stationery a reference to "Official Court Reporter."

The corporation did not assume the $10,000 bank loan which Mr. Jones secured to finance the reporting activities nor did it assume liability for the lease of the Xerox equipment which Mr. Jones leased shortly before incorporation.

The officers and directors of the corporation were petitioners and a notereader for Mr. Jones.

Mr. Jones executed no written assignment of any of his rights as a court reporter to the corporation nor did the corporation execute any document assuming the responsibility for performing any of his functions as a court reporter. During 1968, on the infrequent occasions when Mr. Jones was unable to act as court reporter, substitute reporters were used. The substitute reporters were paid an appearance fee by the corporation although there was no written agreement that it do so. The substitute reporters were independent contractors, not employees of Mr. Jones or the corporation.

The corporation adopted a fiscal year ending February 28, 1969. The initial Federal income tax return of the corporation covered the period from March 19, 1968, through February 28, 1969, and the corporation reported the following amounts of income and claimed the following deductions:

### Income

| | |
|---|---:|
| Gross receipts | $65,188 |
| Interest income | 852 |
| **Total income** | 66,040 |

### Deductions

| | | |
|---|---:|---:|
| Compensation of officers—Elvin V. Jones | | $23,900 |
| Repairs | | 157 |
| Payroll taxes | | 546 |
| Licenses | | 91 |
| Sales tax on automobile | | 180 |
| Colorado income tax | | 1,223 |
| Charitable contributions: | | |
|     Cornerstone Baptist Church | $1,250 | |
|     Calvary Temple | 100 | |
|     Total | 1,350 | |
|     Less: Contributions in excess of limit | 127 | 1,223 |
| Amortization of organization expense | | 40 |
| Depreciation of furniture and fixtures | | 360 |
| Depreciation of automobile | | 3,911 |
| Auto expense | | 207 |
| Credit call | | 5 |
| Dues and subscriptions | | 83 |
| Equipment rental | | 1,859 |
| Insurance | | 73 |
| Office supplies and expense | | 1,543 |
| Outside services | | 5,642 |
| Professional fees | | 1,239 |
| Telephone | | 413 |
| Travel and entertainment | | 7 |
| Miscellaneous | | 98 |
| **Total** | | 42,800 |

The corporation paid no salary to Mr. Jones, but on January 7, 1969, it paid him a bonus of $15,000 and an additional bonus of $8,900 prior to the close of its initial fiscal year on February 28, 1969. The corporation paid Mr. Jones no salary or bonus during its taxable year ended February 28, 1970, but lent him $26,131. The amounts paid to Mr. Jones by the corporation were based upon the advice of the accountants for Mr. Jones and the corporation and were not approved by the board of directors of the corporation in advance, although the board of directors, by general language, subsequently approved and ratified all the acts of the officers.

Petitioners, on their joint Federal income tax return for the taxable year 1968, reported gross income in the amount of $70,156.

Mr. Jones, in 1968, recorded the official proceedings of the District Court by the use of a stenotype shorthand machine. A notereader or Mr. Jones then read the stenotype notes from which she or he typed the transcript. The notereaders who prepared the transcripts were paid on a page rate of compensation and were not employees of Mr. Jones, but were, instead, independent contractors. The same was true after incorporation and they were paid by the corporation. There was no change in personnel resulting from the incorporation. The corporation, during 1968, paid compensation only to Mr. Jones; all other payments for services rendered were paid to individuals as independent contractors. The notes of substitute reporters were transcribed by those reporters in 1968, not by the corporation's notereader.

The stenotype notes prepared by Mr. Jones during all of 1968, which constitute the official record of the proceedings, all bore the following certificate:

I hereby certify that these shorthand or stenotype notes are, to the best of my skill and ability, true and accurate notes of the proceedings contained therein.

Official Court Reporter
United States District Court
for the District of Colorado

The transcripts prepared and sold by Mr. Jones prior to incorporation and the transcripts prepared and sold by the corporation in 1968 all bore the following certificate:

REPORTER'S CERTIFICATE

I, Elvin V. Jones, Certified Shorthand Reporter and Official Reporter to this Court, do hereby certify that I was present at and reported in shorthand the proceedings in the foregoing matter; that thereafter my shorthand notes were reduced to typewriting under my supervision, comprising the foregoing official transcript; further, that the foregoing official transcript is a full and accurate record of the proceedings in this matter on the date set forth.

DATED at Denver, Colorado, this — day of —, 197—.

Elvin V. Jones, CSR, CM, CP.
Official Reporter

Stenographic notes and transcripts of substitute reporters bore certificates signed by them.

Within 7 days after incorporation, the corporation had received $10,413.13 from the sale of transcripts and within 15 days of incorporation it had received $17,832 from such sales. Petitioners, in 1968, advanced no money to the corporation nor did they invest any amounts in addition to the initial investment of $1,500. During March of 1968, after incorporation on March 19, 1968, the corporation paid $6,000 for a Lincoln Continental automobile and during the following month, it purchased a $15,000 savings certificate.

Mr. Jones submitted false quarterly reports to the Administrative Office of the U.S. Courts for 1968 in which he failed to include income received by him and the corporation for transcripts prepared and sold in connection with the El Paso Natural Gas Co. litigation.

The Commissioner, in his statutory notice of deficiency mailed to petitioners, made the following determinations with respect to the income and deductions of the corporation, Elvin V. Jones, Inc., as it related to petitioners:

(a) It is determined that income of $66,040 and expenses of $42,800 reported as being those of Elvin V. Jones, Inc., for the taxable year ended February 28, 1969 represent business income of $63,934 and expenses of $13,559 to you for the taxable year ended December 31, 1968, computed as follows:

Allocation of income from a fiscal year to a calendar year:

| | | |
|---|---:|---:|
| Court reporting income | $63,224 | |
| Interest income | 710 | $63,934 |
| Allowable expenses | | 13,559 |
| Increase taxable income | | 50,375 |

*Explanation of expense adjustment:*

The amount of $42,800 claimed as business expenses on the return of Elvin V. Jones, Inc., is not allowed to the extent of $29,241 on your individual return because it has not been established that any amount in excess of $13,559 represents an ordinary and necessary business expense or was expended for the purpose designated. The specific items disallowed follow:

| | | |
|---|---:|---|
| Salary | $23,900 | (see item d) |
| Depreciation on automobile | 3,911 | |
| Auto expense | 207 | |
| Contributions | 1,223 | (see item e) |
| Total | 29,241 | |

The above adjustments are made in accordance with the authority contained in Sections 482 and 61(a) of the Internal Revenue Code.

OPINION

The sole issue to be decided is whether a portion of the net income of the corporation Elvin V. Jones, Inc., should be reported by its sole shareholders, the petitioners. The issue is factual. The Commissioner, in his statutory notice of deficiency, determined that such income was taxable to petitioners under the provisions of sections 61(a) and 482.

Respondent's argument under section 61(a) is based upon two propositions: (1) That the corporation was a "sham" because it was organized for tax purposes only and (2) that Elvin V. Jones earned the income individually and he could not properly assign his rights to that income to escape taxation.

Petitioners have failed to convince us that the corporation was organized for genuine business purposes. A careful analysis of all the evidence indicates, instead, that the corporation was organized primarily, if not exclusively, for tax purposes. At the trial, the parties agreed that proof of events subsequent to the year in issue, 1968, was admissible to show Mr. Jones' intent in organizing the corporation. We, therefore, admitted such evidence. In their briefs, petitioners did not request us to find facts as to the subsequent events. Apparently, they have abandoned that position. Even if the subsequent events were considered, they would not change the result.

In petitioners' favor, we have found that the corporation was organized with the necessary legal formalities but beyond that there are substantial factors which point only to tax motives. Petitioners testified that their primary purposes were to limit their liability because of the substantial financial risks involved in the El Paso Natural Gas Co. litigation, to provide for continuity of the enterprise in the event of Elvin V. Jones' death, and to establish a general court reporting business. During 1968, the corporation did no general court reporting. It carried out precisely the identical functions previously carried on by Mr. Jones individually. There were no attempts made in 1968 to expand the business into other endeavors. The purpose of providing for the continuity of the business enterprise in the event of Mr. Jones' death is also spurious. Mr. Jones personally was ap-

pointed as an official court reporter. Upon his death, there would be no transcript business for the corporation because there would be no stenographic notes certified by him to forward to the corporation.

Petitioners relied most heavily upon their avowed purpose to limit their liability because of the magnitude of the El Paso Natural Gas Co. business. A close examination of this purpose reveals obvious flaws. It was supposedly based upon advice of accountants and a lawyer recommended by the accountants. Mr. Jones' testimony was vague and he was evasive on cross-examination when an attempt was made to explore the opinion upon which he based his view that liability would be limited. We doubt if such an opinion was obtained. If it were, petitioners would have readily produced it to support their position or explained their inability to do so. *Wichita Terminal Elevator Co.*, 6 T.C. 1158 (1946), affd. 162 F.2d 513 (10th Cir. 1947). We do not undertake to examine the legal question as to whether Mr. Jones could limit his liability by incorporating the transcript production and sale phase of his endeavors. Nevertheless, we have serious doubts as to whether his liability could thus be limited because he continued to certify the correctness of the transcripts, an act which he was required to perform as prescribed by law. His official duties required him to prepare and sell transcripts. The fears he expressed as to liability were not founded upon knowledge that other reporters had suffered from such liability. He admitted that he knew of no such cases. No doubt Mr. Jones worked very hard on the El Paso Natural Gas Co. proceedings and no doubt he was "uptight" about its magnitude. Nevertheless, he has not convinced us that he had a reasonable cause to believe that incorporation would protect him from liability.

Petitioners' actions demonstrate that they had no concern for limiting their liability. Liability for lease rentals on the Xerox equipment was not assumed by the corporation nor was the bank loan of $10,000. We see no liability undertaken by the corporation which would relieve petitioners of liability. The risk of failure hardly seems genuine. At the time of incorporation, petitioners obviously had substantial work in process because the corporation received $10,413.13 within 7 days after incorporation and an additional $7,418.87 within the following 8 days. Within only 12 days after incorporation, petitioners were

confident enough for the corporation to pay $6,000 for a Lincoln Continental automobile. In the following month, the corporation purchased a $15,000 savings certificate.

Business continued as usual after incorporation. The corporation had no salaried employees; instead, it paid the identical independent contractors for services as had Mr. Jones. The corporation paid attendance fees for substitute reporters but there was no written agreement for such an undertaking. The substitute reporters' activities included taking shorthand notes which Mr. Jones continued to do personally after incorporation but the only explanation of this inconsistency offered by Mr. Jones was that the board of directors of the corporation (composed of himself, his wife, and a notereader) agreed with him that the corporation would assume this liability.

There was no employment contract between Mr. Jones and the corporation. He received no salary until January 7, 1969, in his taxable year 1969, at which time he was paid $15,000. In 1968, petitioners had received $70,156 in gross income. By choosing a fiscal year ended February 28, petitioners and the corporation could shift the tax burden to the greatest advantage by the salary deduction to the corporation, by insulating petitioners from tax because of the corporate entity, and by reporting the salary income in a taxable year when advantageous. The corporation paid him no salary during its taxable year ended February 28, 1970, although he apparently performed services identical to those performed in the previous year. The corporation, in the taxable year ended February 28, 1970, had insufficient income to be subject to the surtax rate but lent Mr. Jones $26,131. Mr. Jones admitted that the bonuses were paid to him upon the advice of accountants and there are no minutes of the board of directors authorizing the bonuses, merely subsequent ratification of the acts of the officers in general terms. These facts, coupled with all the other evidence, indicate use of the corporation for shifting income to the lowest tax bracket. When cross-examined on the salary paid him, Mr. Jones was evasive and unconvincing. Mr. Jones' admission that he filed false reports on the income derived from transcripts with the Administrative Office of the U.S. Courts hardly persuades us to give full weight to his testimony. His evasiveness when cross-examined on this point was likewise disturbing. We also note that adjustments made in

the statutory notice of deficiency disallowing depreciation, auto expense, and other expenses were not contested by petitioners.

In short, we believe that Mr. Jones organized the corporation in order to shift the "bulge" in his income caused by the El Paso Natural Gas Co. business to lower income tax brackets. A corporation is not a "sham" if it was organized for legitimate business purposes or if it engages in a substantial business activity. *Moline Properties v. Commissioner*, 319 U.S. 436 (1943); *Perry R. Bass*, 50 T.C. 595 (1968). Although we hold that the corporation was not organized for a legitimate business purpose we, nevertheless, hold that it engaged in substantial business activity. The corporation, through independent contractors which it paid, produced and sold transcripts for substantial sums of money. Accordingly, we hold that the corporation was not a "sham" for tax purposes.

Recognition of the corporation as a viable tax entity does not completely bridge petitioners' journey over the pitfalls of section 61(a) because petitioners' scheme was no more than an assignment of income earned by Mr. Jones. In *Paul W. Trousdale*, 16 T.C. 1056, 1065 (1951), affd. 219 F.2d 563 (9th Cir. 1955), we stated—"it has long been held that a taxpayer may not avoid his tax liability on income which he has earned by the simple expedient of drawing up legal papers and assigning that income to others." Here, there were not even any "legal papers" to reflect the assignment of income. Mr. Jones merely relied upon a verbal understanding with his controlled board of directors. It would have been interesting to see what kind of an assignment could have been made because we doubt if it would be binding on third parties. Certainly, it would not bind the United States because the statute required Mr. Jones personally to prepare and sell the transcripts and the price was set by the judicial conference. Mr. Jones personally certified the transcripts. Mr. Jones was the true earner of the income. The activities of the independent contractors meant nothing without Mr. Jones' certificate and the chief judge of the District Court recognized the importance of the certificate when he directed Mr. Jones not to include the phrase "Official Court Reporter" on the corporation's stationery. Mr. Jones individually continued to be under the direct dominion and control of the judge to whom he was assigned after incorporation because the preparation, certification and sale of transcripts were all part of his official duties. The division of

functions here has not been shown to be customary or usual, but is, instead, unusual. Cf. *Edwin D. Davis,* 64 T.C. 1034 (1975). It is likewise not a situation where the corporate employees provided all of the services to the third parties. Cf. *Edwin D. Davis, supra.*

Mr. Jones was free to "funnel" income elsewhere as he had no binding agreement with the corporation. Likewise, if he ceased to give his shorthand notes to the corporation, it could earn no income in 1968. *Richard Rubin,* 56 T.C. 1155 (1971), affd. per curiam 460 F.2d 1216 (2d Cir. 1972). The Commissioner is, therefore, sustained in his determination under section 61(a).

Petitioners have also failed to show that the Commissioner abused the discretion granted to him in section 482 by allocating income and expenses of the corporation to them. Petitioners offered no proof as to work-in-process or receivables transferred to the corporation, yet there must have been some because the corporation received $10,413.13 within 7 days after incorporation and an additional $7,418.87 within the following 8 days. Obviously, a substantial part of this income accrued prior to incorporation because one or two notereader-typists could not generate these amounts of income in such timespans. Another specific item reflecting the appropriateness of the Commissioner's allocation was the payment by the corporation of appearance fees for the substitute reporters.

In addition to the "beginning" income described above, the Commissioner's allocation in general was proper because petitioners have failed to prove that he abused his discretion. The duties of Mr. Jones as official court reporter are detailed by statute. We recognize that, in practice, he may delegate the typing, reproduction, and assembling of the transcripts to persons under his supervision. Nevertheless, he cannot fragment, for tax purposes, his official functions which cannot be delegated, such as certifying his notes and certifying, reproducing, and selling transcripts. Cf. *Edwin D. Davis, supra.* The typing, reproduction, and assembling of transcripts is meaningless without Mr. Jones' certificate. The interdependence of Mr. Jones' statutory duties requires the income to be taxable to him under section 482. The Court of Appeals for the Tenth Circuit, to which an appeal would lie in the instant case, explained the purpose and effect of section 482 as follows in *First Security Bank of Utah, N.A. v. Commissioner,* 436 F.2d 1192, 1195 (10th Cir. 1971), affd. 405 U.S. 394 (1972):

In Likins-Foster Honolulu Corp. v. Commissioner of Internal Revenue, 10 Cir., 417 F.2d 285, 292, cert. denied 397 U.S. 987, 90 S.Ct. 1117, 25 L.Ed. 2d 395, we recognized the purpose and effect of sec. 482, and the regulations thereunder, Treasury Regulations on Income Tax (1954), 26 C.F.R. sec. 1.482-1(b) and (c), provide that the standard to be applied in every case of a sec. 482 allocation "is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer" and that:

"The authority to determine the true taxable income extends to any case in which either by inadvertence or design the taxable income, in whole or in part, of a controlled taxpayer, is other than it would have been had the taxpayer in the conduct of his affairs been an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer."

In the situation here, an uncontrolled taxpayer could not have dealt with another uncontrolled taxpayer as Mr. Jones dealt with the corporation because the functions of Mr. Jones in reporting the proceedings by stenographic note taking and the functions of the corporation in producing, selling, and certifying the transcripts must, by statute, be performed by the official court reporter, who must be an individual.

There was no written transfer of the intangible asset which generated the income for the corporation; i.e., the certification of the transcript, because it could not be transferred. *Pauline W. Ach*, 42 T.C. 114 (1964), affd. 358 F.2d 342 (6th Cir. 1966), cert. denied 385 U.S. 899 (1966). Nor was there any payment to Mr. Jones by the corporation for the use of the shorthand notes. The notes were the most important "raw material" which the corporation used to produce its only product, the transcript. Even petitioners have made no contention that the sporadic, tax-timed bonuses paid to Mr. Jones were payments for the notes instead of compensation. Mr. Jones reported the bonuses as compensation and the corporation deducted the bonuses as compensation.

Petitioners rely upon *Fontaine Fox*, 37 B.T.A. 271 (1938). That case is distinguishable in many respects. The corporation there had contracts with third parties; its separate identity was not challenged by the Commissioner; and the individual taxpayer was contractually bound to render services to the corporation.

Petitioners rely heavily on the "professional corporation" cases, *United States v. Empey*, 406 F.2d 157 (10th Cir. 1969); *United States v. Kintner*, 216 F.2d 418 (9th Cir. 1954); *Galt v. United States*, 175 F. Supp. 360 (N.D. Tex. 1959); and *Foreman v. United States*, 232 F. Supp. 134 (S.D. Fla. 1964). The reliance on those cases completely ignores our Court-reviewed decision in

*Jerome J. Roubik,* 53 T.C. 365 (1969). There we distinguished "professional corporation" cases from those in which the issue is allocation of income between related taxpayers. We continue to follow the distinction pointed out in the majority opinion and also call attention to the concurring opinion which further expresses the distinction.

The Commissioner's determination is, therefore, sustained under both sections 61(a) and 482 of the Code.

*Decision will be entered for the respondent.*