DANIEL F. KELLER AND MARILYN F. KELLER, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 7128–79.    Filed October 29, 1981.

*Richard G. Taft, Philip D. Hart,* and *John N. Schaefer,* for the petitioners.
*Patrick E. McGinnis,* for the respondent.

NIMS, *Judge:* Respondent determined deficiencies in petitioners' income tax for the years 1974 and 1975 in the respective amounts of $25,375.46 and $34,195.77. The issue for decision is whether income attributable to petitioner Daniel F. Keller's medical practice is taxable to him instead of his wholly owned professional corporation.

## FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation and the exhibits attached thereto are incorporated herein by reference.

At the time the petition in this case was filed, petitioners resided in Oklahoma City, Okla.

Petitioner Daniel F. Keller (petitioner) is a licensed physician whose medical practice is limited to the specialty of pathology. He is certified by the American Board of Pathology in both clinical and anatomical pathology.

Generally, a pathologist acts as a consultant to a patient's primary treating physician. A pathologist prepares written reports which set forth findings resulting from an examination of a patient's tissue, blood, or other specimens. Since the pathologist normally functions as a consultant to the treating physician, patient contact is minimal. To the extent that the duties of a pathologist entail patient contact, it is usually in the role of consultant and not as the treating physician. Many pathologists practice in hospital settings where they are able to utilize the hospital's laboratory facilities and the services of its medical technicians in preparing specimens for examination.

Petitioner practiced pathology both in a hospital and in an independent medical laboratory. In the early part of his career, he served on the medical staff of Presbyterian Hospital in Oklahoma City, Okla. In 1968, he relinquished his staff position with the hospital and became associated with Medical Arts Laboratory (MAL), a partnership composed of several physicians engaged in the practice of pathology. Petitioner became a partner in MAL in 1969 or 1970.

MAL renders pathology services to many hospitals and physicians throughout the State of Oklahoma. MAL receives its laboratory and technical support from Medical Arts Laboratory, Inc. (MAL, Inc.), a corporation organized under the Oklahoma Business Corporation Act. Neither MAL nor its partners individually own any medical supplies or laboratory equipment, or employ any medical or technical personnel. MAL compensates MAL, Inc., for the laboratory and technical services it provides to MAL. The partners of MAL render quality-control supervisory services to MAL, Inc., and are compensated accordingly.

All of the MAL partners were shareholders and directors of MAL, Inc., during the years in issue. MAL, Inc., paid and maintained the offices of MAL, employed the nurses and medical technologists, and purchased all of the necessary supplies for MAL.

Prior to December 3, 1973, petitioner's income from his pathology practice came from two sources: (i) His share of partnership profits of MAL and (ii) his compensation from MAL, Inc., for the supervisory services he rendered.

Sometime during 1973, petitioner became concerned about his family's future financial needs. Until that time, his planning in that regard had been minimal. Petitioner consequently sought the advice of an attorney and some pension consultants. He was informed of the various perceived advantages of incorporating his professional practice, in particular, the adoption of a pension plan for himself. Petitioner was also aware that incorporation of his practice could provide him with a more liberal medical reimbursement plan than that under which he was then covered through MAL.

On December 3, 1973, petitioner caused a professional corporation, Dan F. Keller, M.D., Inc. (Keller, Inc.), to be organized under the Oklahoma Professional Corporation Act. At the organizational meeting, petitioner, who was the sole shareholder, was duly elected as sole director. Pursuant to that meeting, Keller, Inc., also adopted corporate bylaws; elected petitioner president-treasurer and his wife, petitioner Marilyn F. Keller, secretary; appointed a bank in Oklahoma City as the official depository bank; adopted a section 1244[1] stock plan (relating to losses on "Small Business Stock"); set petitioner's annual salary; adopted an employees medical expense reimbursement plan; adopted an employees wage continuation plan; adopted a defined benefit pension plan and trust; and approved an employment contract between petitioner and Keller, Inc., which was dated the date of the meeting.

As stated above, petitioner was the sole shareholder of Keller, Inc., having subscribed for and purchased on December 3, 1973, 500 shares of the common stock. Such shares constituted all of the then-issued and outstanding stock. Petitioner

---

[1]All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, unless otherwise specifically indicated.

ceased to be a partner of MAL, and Keller, Inc., was substituted as a partner pursuant to a written agreement executed by petitioner, all the other partners of MAL, and Keller, Inc. Pursuant to the agreement between petitioner and the MAL partners, petitioner also personally agreed to guarantee all obligations arising out of the relationship between Keller, Inc., and the partnership.

Under the aforesaid employment contract, petitioner agreed to render his services as a pathologist to Keller, Inc., in return for an annual salary of $60,000.

Within 2 months after its creation, Keller, Inc., opened a checking account with a bank in Oklahoma City; it maintained and used that account during all of 1974 and 1975. On or about July 31, 1975, Keller, Inc., also opened a savings account with a savings and loan association in Oklahoma City.

Shortly after December 3, 1973, Keller, Inc., applied to the Internal Revenue Service for an employer identification number. In addition, petitioner's name was removed from the entrance door to the MAL facility and the name "Dan F. Keller, M.D., Inc." was substituted for petitioner's name. A similar substitution was effected on the letterhead of the various laboratory test report and consultation report forms which MAL uses in its practice.

Keller, Inc., filed an initial franchise tax return with the State of Oklahoma, regularly filed annual franchise tax returns in 1974 and 1975, and received annual corporate licenses from the State of Oklahoma for 1974 and 1975. Keller, Inc., filed annual certificates of professional corporation with the Oklahoma secretary of state in 1974 and 1975, and also, for both of those years, filed appropriate returns with the Oklahoma Employment Security Commission and paid the contributions thereunder (relating to unemployment compensation coverage).

Keller, Inc.'s pension plan, which had been adopted at its first organizational meeting, was submitted to the Internal Revenue Service for a determination of its qualification under section 401(a). In a letter dated February 7, 1977, the Internal Revenue Service determined that the plan would be qualified if the amendments proposed by Keller, Inc.'s representative (in a letter dated December 14, 1976) were adopted.

Keller, Inc., maintained books of account during all of 1974

and 1975, consisting of general ledgers, prepared balance sheets, and profit and loss statements.

After entering into the employment contract with Keller, Inc., petitioner devoted all of his professional time and effort to such employment on a full-time basis, with the single exception of certain services rendered to MAL, Inc., in 1974, as outlined below. Keller, Inc., compensated petitioner for his services by paying him salaries in the amounts of $55,000 and $61,000 for 1974 and 1975, respectively. During 1974 and 1975, Keller, Inc., withheld Federal and State income taxes and FICA employee taxes from the salary it paid to petitioner, and it regularly remitted the appropriate withheld amounts to the Internal Revenue Service and the Oklahoma Tax Commission.

During the years in question, Keller, Inc., received monthly partnership draws from MAL totaling $84,000 and $105,000 for 1974 and 1975, respectively; these amounts were deposited in due course in its bank account.

Although Keller, Inc., had been substituted as a partner in MAL by way of the agreement among petitioner, MAL, and Keller, Inc., dated December 3, 1973, a similar agreement respecting the compensation paid by MAL, Inc., for the supervisory services rendered to it was not executed until January 1, 1975. During 1974, MAL, Inc., paid $21,076.80 attributable to such supervisory services, all of which was deposited in the bank account of Keller, Inc. The checks from MAL, Inc., which were used to pay the $21,076.80 were printed by a computer and made payable to "Dan F. Keller, M.D." Petitioner was concerned about the use of his individual name as the payee. At petitioner's request, the personnel of MAL, Inc., who were responsible for preparing checks, typed in the word "Inc." after the checks came out of the computer so that the payee's name read "Dan F. Keller, M.D., Inc."

During 1974, MAL, Inc., continued to withhold Federal and State income taxes and FICA employee taxes from amounts attributable to work performed by petitioner. At the year's end, MAL, Inc., issued a Form W–2 to petitioner which reflected gross compensation of $21,076.80 and total withholding in the amount of $4,168.07.

On petitioners' 1974 return, the gross compensation of $21,076.80 from MAL, Inc., was reported as income. The net compensation of $16,908.73 was deducted as a business ex-

pense for "Fees paid to Daniel F. Keller, Inc." on Schedule C, and was explained in an attached statement as follows:

All medical fees to Daniel F. Keller, M.D., are deposited directly to the account of Daniel F. Keller, M.D., Inc., as was the money on the W–2 from Medical Arts Laboratory, Inc. Medical Arts Laboratory, Inc. erroneously withheld FICA, FWH and SWH. The rest of the fees were then deposited as is the practice to Dan F. Keller, M.D., Inc. This problem has been corrected for 1975, but for 1974 the total is included in the amount on Line 9, and the FICA, FWH and SWH are shown on the proper lines. The balance is shown on Schedule C as fees paid to Dan F. Keller, Inc., since they did actually receive the money, and the money was reported as income to Dan F. Keller, Inc.

As a result, Keller, Inc., reported allocable portions of the $16,908.73 net compensation as income to it on its corporate Federal income tax returns for its fiscal years ending November 30, 1974, and November 30, 1975.

Keller, Inc., made contributions to the Dan F. Keller, M.D., Inc., Pension Trust totaling $22,223.20 for the fiscal year ended November 30, 1974, and $44,000 for the fiscal year ended November 30, 1975.

The medical expense reimbursement plan adopted by Keller, Inc., provided for reimbursement of $7,000 in qualified medical expenses of petitioner unless increased by the board of directors. During 1974, petitioner received reimbursement for medical expenses totaling $5,990.05; the corresponding figure for 1975 was $3,742.36.

Both MAL and MAL, Inc., maintained offices at 1111 North Lee and 1211 North Shartel in Oklahoma City from 1973 through 1975, and MAL, Inc., paid the rent for both offices. Petitioner's principal working location before and after December 1973 was 1211 North Shartel, Oklahoma City.

Except for a 1976 Mercury Cougar XR–7 which was leased on December 30, 1975, Keller, Inc., did not own or lease any equipment during 1974 or 1975. For its fiscal years ended November 30, 1974, and November 30, 1975, Keller, Inc., did not purchase any property; own any depreciable property; incur any indebtedness, interest, advertising, or rental expenses; or have any employees or contract labor other than petitioner (and his spouse for the latter year).

During 1973, MAL earned partnership income in the amount of $847,960. Petitioner reported $96,533 on his distributive share, or 11.38 percent thereof. Petitioner's share of

MAL's charitable contributions was $12,803. His income from MAL, Inc., was $21,955.82.

During 1974, MAL earned partnership income in the amount of $1,016,732; $110,392 was Keller, Inc.'s distributive share, or 10.85 percent thereof. Keller, Inc.'s share of the MAL contributions for that year was $17,160.

During 1975, MAL earned partnership income in the amount of $1,281,862; $133,842 was Keller, Inc.'s distributive share, or 10.44 percent thereof. Keller, Inc.'s share of the MAL contributions was $26,664.

During the calendar years 1974 and 1975, Keller, Inc., received regular, equal partnership distributions from MAL. Keller, Inc., received distributions from MAL in the amount of $77,000 during its fiscal year ended November 30, 1974. Keller, Inc., reported $87,044.86 in gross income on its original income tax return for its fiscal year ended November 30, 1974, and $4,233.35 in taxable income.

Keller, Inc., subsequently filed an amended return for the aforesaid fiscal year and reported a revised gross income in the amount of $10,447.66. This adjustment was explained as being the result of erroneously including the MAL partnership distributions in income. Since Keller, Inc., was on a November 30 fiscal year, it took the position that as a partner of MAL, it was only required to report partnership income for the partnership year ending with or within the fiscal year of the corporate partner, Keller, Inc. Consequently, Keller, Inc., reported a $72,333.85 net operating loss on its amended return for the fiscal year ended November 30, 1974.

Keller, Inc., reported $129,560.95 in gross income on its corporate income tax return for the fiscal year ended November 30, 1975, and zero taxable income.

## OPINION

On December 3, 1973, petitioner, a licensed pathologist, formed Keller, Inc., a corporation under the Oklahoma Professional Corporation Act. At that time, Keller, Inc., was substituted for petitioner as a member of MAL, a partnership in which petitioner had been, up to that time, a partner. Substantial care was taken to observe the requisite corporate formalities in connection with the organization of Keller, Inc., including the execution of an employment agreement between

the corporation and petitioner. Thus, without question, Keller, Inc., was organized as a corporation under Oklahoma law, as required for recognition as such by the Commissioner under Rev. Rul. 70–101, 1970–1 C.B. 278. Also, so far as the record reveals, it is not illegal under Oklahoma law for Keller, Inc., to engage in the practice of pathology. Rev. Rul. 70–101, *supra.*

At its organizational meeting, Keller, Inc., adopted, among other things, a defined benefit pension plan, a medical reimbursement plan, a wage continuation plan, a section 1244 stock plan, and an employment contract between Keller, Inc., and petitioner. Petitioner was initially, and during the years in question continued to be, the sole shareholder and sole director of the corporation. Keller, Inc., is thus a so-called one-man professional corporation, and petitioner is the sole employee of the corporation rendering services to entities outside the corporation, and he is the principal, if not sole, beneficiary of its employee benefit plans.

Moneys were received by Keller, Inc., and in turn, compensation was paid to petitioner pursuant to his employment agreement with the corporation. This compensation included contributions made to the qualified pension plan on petitioner's behalf and payments to him under the medical expense reimbursement plan. The parties do not dispute that petitioner's concern about his family's financial needs was the primary reason for Keller, Inc.'s formation. As an employee of Keller, Inc., petitioner was able to obtain the substantial advantages of a defined benefit pension plan maintained by a corporation and a liberal medical expense reimbursement plan.

Respondent seeks to tax petitioner directly on all of the income which Keller, Inc., received on two alternative theories: as gross income under section 61(a), or via the statutory authority given to the Commissioner to allocate gross income among or between controlled "organizations, trades, or businesses" under section 482.[2]

We believe that section 482 provides the proper result in this case. Section 482 allows the Commissioner to allocate income

---

[2]We note that the question of the legal effect of a one-man professional corporation participating as a partner in a partnership of physicians was neither raised as an issue in this case nor briefed by the parties.

among related taxpayers to prevent the evasion of taxes or clearly to reflect the income of each taxpayer's business activities.[3] Respondent's section 482 allocation should not be set aside unless clearly shown to be unreasonable, capricious, and arbitrary. *Ballentine Motor Co., Inc. v. Commissioner*, 321 F.2d 796 (4th Cir. 1963).

Section 482 properly applies to the one-man personal service corporation situation. Some commentators question whether it is appropriate to apply section 482 in the case of a sole shareholder who renders services to his corporation as an employee where the shareholder could perform the services as a single business without the corporation.[4] It appears to us that these writers misinterpret the threshold requirement of dual businesses or organizations in section 482. The dual business requirement is not a preclusive obstacle to the application of section 482 in this case. It has been noted that the legislative history of the predecessor of section 482[5] suggests that the terms "trade," "business," and "organization" are to be broadly construed. *Wilson v. United States*, 530 F.2d 772, 777 (8th Cir. 1976) revg. and remanding an unreported District Court decision (W.D. Mo. 1974, 34 AFTR 2d 74–5719, 74–2 USTC par. 9646). Furthermore, the regulations promulgated under section 482 are broadly written so as to cover any type of entity or enterprise which has independent tax significance. Sec. 1.482–1(a)(1) and (2), Income Tax Regs. Other courts and this Court have not been reluctant to rely upon section 482 in a shareholder/corporation context and in a sole employee/corporation case.. *Wilson v. United States, supra*; *Borge v. Commissioner*, 405 F.2d 673 (2d Cir. 1968), affg.

---

[3] SEC. 482. ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAXPAYERS.

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

[4] See Fuller, Section 482 Revisited, 31 Tax. L. Rev. 475, 480 (1976); Seieroe & Gerber, Section 482—Still Growing at the Age of 50, 46 Taxes 893, 896 (1968).

[5] "While it is believed that the language of the present law is broad enough to include 'organizations,' this word is added to remove any doubt as to the application of this section to all kinds of business activity." H. Rept. 704, 73d Cong., 2d Sess. 24 (1934), reprinted in 1939–1 C.B. (Part 2) 554, 572.

a Memorandum Opinion of this Court, cert. denied 395 U.S. 933 (1969); *Rubin v. Commissioner*, 56 T.C. 1155 (1971) (reviewed by the Court), affd. per curiam 460 F.2d 1216 (2d Cir. 1972).

For example, in *Ach v. Commissioner*, 42 T.C. 114 (1964), affd. 358 F.2d 342 (6th Cir. 1966), cert. denied 385 U.S. 899 (1966), the taxpayer, Pauline Ach, had operated a successful retail dress and apparel business as a sole proprietor for 29 years. In August of 1953, this business and its operating assets were transferred to a corporation, all of whose stock was owned by two sons of the taxpayer. Prior to the transfer of the dress business, the corporation had, for a number of years, operated a dairy business which incurred substantial losses. At the time of the transfer, the dairy business had ceased operations and the corporation's sole activity consisted of leasing the land and buildings which had been used in its dairy operations.

During the years in issue in *Ach*, the taxpayer was president, treasurer, and chairman of the board, although she was not a shareholder. She continued to manage the dress business but received no compensatory payments for the services she rendered. This Court found that 70 percent of the dress business income reported by the corporation was allocable to the taxpayer under section 482. Noting that the statute is remedial in character and its provisions broad and sweeping, the Court stated that the taxpayer "did not cease to be a separate taxpayer or 'organization,' 'trade,' or 'business,' within the purview of these provisions by reason of her 'sale' of the naked assets of the dress business to the corporation." *Ach v. Commissioner, supra* at 124.

Section 482 is applicable in this case because the issue involves the allocation of income between two separate taxpaying entities which satisfy the dual business requirement discussed above. Respondent does not dispute Keller, Inc.'s classification as a corporation for Federal tax purposes. See also Rev. Rul. 77–31, 1977–1 C.B. 409; Rev. Rul. 70–101, *supra*.[6] In this case there are, in actuality, two levels of

---

[6] As stated in his opening brief, "Respondent is contending here that the true owner of the income in question is Keller, not KELLER, INC., even though KELLER, INC. is classified as a corporation for federal tax purposes."

operating the medical practice in question: the corporate and
employee levels. The business of Keller, Inc., is that of
providing pathology services as a partner of MAL. The
corporation employs petitioner to perform the requisite ser-
vices. Petitioner, in turn, is in the business of providing
services as an employee of his wholly owned corporation.[7] See
*Primuth v. Commissioner*, 54 T.C. 374 (1970) (employee held to
be in a trade or business for purposes of section 162). The
patent artificiality of the corporate fiction is strikingly illus-
trated when there is a business activity which could be
conducted by the corporation's sole shareholder outside of the
corporation. Nonetheless, this conceptual analysis is man-
dated by the policy that corporations be recognized, apart from
their shareholders, regardless of their size. *Moline Properties,
Inc. v. Commissioner*, 319 U.S. 436 (1943).[8] Accordingly, it is
our opinion that section 482 authorizes respondent to allocate
income between the two "businesses" in this case to the extent
required by the policies underlying that section.

Respondent herein seeks to allocate to petitioner 100
percent of the income which Keller, Inc., reported. Because
Keller, Inc., is a viable taxpaying entity which conducts a
business activity, section 482 requires a careful allocation of
income between Keller, Inc., and petitioner. In these circum-
stances, section 482 does not authorize an allocation which
would, in effect, disregard the existence of the corporation.
Compare *Philipp Bros. Chemicals, Inc. (N.Y.) v. Commissioner*,

[7] *Whipple v. Commissioner*, 373 U.S. 193 (1963), a case relied on by the petitioners in *Rubin v. Commissioner*, 56 T.C. 1155 (1971) (reviewed by the Court), affd. per curiam 460 F.2d 1216 (2d Cir. 1972), does not require a contrary view. The issue in *Whipple* was whether an individual shareholder's devoting of time and effort to his corporation as an investor (and not as an employee) constitutes a business for purposes of the bad debt deduction. Here, part of petitioner's expected financial return is also as an employee. His income is compensation for services and is not "income, profit or gain in the form of dividends or enhancement in the value of an investment." *Whipple v. Commissioner, supra* at 202. See also *Borge v. Commissioner*, 405 F.2d 673, 676 (2d Cir. 1968), affg. a Memorandum Opinion of this Court, cert. denied 395 U.S. 933 (1969).

[8] We note that the corporate form may be ignored for tax purposes if it is so unreal as to constitute a "bald and mischievous fiction." *Moline Properties, Inc. v. Commissioner*, 319 U.S. 436 (1943). In this case, respondent did not press any argument that the corporation was a sham.

435 F.2d 53 (2d Cir. 1970), with *W. Braun Co. v. Commissioner*, 396 F.2d 264 (2d Cir. 1968). We hold that, to the extent respondent attempts to shift all of Keller, Inc.'s income to petitioner under section 482, his determination is arbitrary and capricious.

The question under section 482 is whether Keller, Inc., and petitioner would have entered into their financial relationships had they been unrelated parties dealing at arm's length. *Ach v. Commissioner, supra*; sec. 1.482–1(b)(1), Income Tax Regs. In making this determination, the relevant inquiry is whether the total compensation (taking into account current salary as well as pension plan contributions and the medical expense reimbursements), which was paid to petitioner or contributed on his behalf after the incorporation of Keller, Inc., was essentially equivalent to that which he would have received absent incorporation.[9] Assuming that Keller, Inc.'s share of partnership profits from MAL and its fees from MAL, Inc., continued to be on a par with those payments in the pre-incorporation years, one would expect petitioner, in an arm's-length transaction with an unrelated party, to have bargained for a total compensation package which would approximate the amounts he previously received as a sole proprietor. One would similarly expect that petitioner's total compensation would also reflect any increase in MAL and MAL, Inc.'s earnings over and above the pre-incorporation years. To the extent of any meaningful disparity between these amounts, it is our view that the Commissioner is correspondingly justified in making an adjustment in petitioner's income to properly reflect the true taxable income he earned in his capacity as Keller, Inc.'s employee. See sec. 1.482–2(b)(1), Income Tax Regs. Although it has been held that a corporation is not required to pay a salary to an officer who performs services on its behalf (see *Gross v. Commissioner*, 23 T.C. 756, 773 (1955), affd. 236 F.2d 612 (2d Cir. 1956)),[10] particular scrutiny is necessary when an individual incorporates an existing service

---

[9]See, e.g., *Borge v. Commissioner*, 405 F.2d 673 (2d Cir. 1968), affg. a Memorandum Opinion of this Court, cert. denied 395 U.S. 933 (1969), where the taxpayer's salary was substantially below the gross receipts which his entertainment activities generated.

[10]*Gross v. Commissioner*, 23 T.C. 756 (1955), affd. 236 F.2d 612 (2d Cir. 1956), is not apposite since the precise issue there was not whether additional income should be allocated to the

profession and the corporation's only business activity is effected solely through the efforts of the individual as an employee of the corporation. A careful examination of the financial arrangements entered into will be required in order to ascertain whether an adjustment is necessary, either to clearly reflect income or to prevent tax avoidance.

The facts indicate that petitioner's distributive share of income from MAL for the year 1973 was $96,533,[11] with his compensation from MAL, Inc., for the same year totaling $21,955.82. For 1974, petitioner reported $55,000 in salary from Keller, Inc., and $21,076.80 in compensation from MAL, Inc. However, petitioner deducted $16,908.73 from Schedule C as a "business loss." This figure represents the total net amount from MAL, Inc., which was deposited to the account of Keller, Inc. For the year 1975, petitioners reported $68,200 in income received from Keller, Inc.: $61,000 of this amount being paid as salary to petitioner and $7,200 being paid as salary to petitioner's wife.

On Keller, Inc.'s return for the taxable year ended November 30, 1974, it originally reported $87,044.86 in gross receipts; deductions for compensation were $53,557.66, representing salaries and wages, $22,223.20 for pension plan contributions, and $5,990.05 for medical reimbursement plan payments. Keller, Inc., subsequently filed an amended return and reported a revised taxable income of $10,447.66. This adjustment was explained as being a correction of a prior erroneous inclusion of the partnership draws from MAL in Keller, Inc.'s income, since Keller, Inc., was not required to report its distributive share of partnership income from MAL until it filed its corporate return for its fiscal year within which ended MAL's relevant partnership year. Sec. 706(a). As a result, Keller, Inc., reported a $72,333.85 net operating loss on its return for such fiscal year.

On its return for the taxable year ending November 30, 1975, Keller, Inc., reported gross income receipts in the amount of $129,560.95. The deductions for compensation were

---

officers/shareholders, but rather whether income which had been received and reported as a nontaxable dividend should be recharacterized as compensation.

[11]This figure does not reflect $12,803 in MAL's charitable contributions which passed through to petitioner under sec. 702(a)(4).

$60,000 to petitioner, $7,200 to petitioner's wife, $24,825.80 for pension plan[12] contributions, and $3,742.36 for employee benefit programs (the medical expense reimbursement plan).

The distributive shares for Keller, Inc., from MAL for the years 1974 and 1975 were $110,392 and $133,842, respectively.[13]

We are of the opinion that a portion of the income which Keller, Inc., reported for the fiscal year ended November 30, 1974, should be taxable directly to petitioner. The record shows that, for the entire year, petitioner performed supervisory services for MAL, Inc., in his individual capacity: the MAL partnership failed to effect a substitution of Keller, Inc., as the party which would render the services to MAL, Inc. Indeed, the checks from MAL, Inc., were originally issued by its computer to the order of petitioner, and withholding for petitioner's Federal and State income taxes and FICA taxes continued. The amount of Federal income tax withheld on the MAL, Inc., income was also reported on petitioner's return as Federal income tax withheld for purposes of computing petitioner's tax payments. Because the MAL partnership did not substitute Keller, Inc., for petitioner in its (MAL's) contractual obligation to MAL, Inc., until 1975, petitioner remained directly taxable on the income received from this source in 1974, and we so hold. Section 482 requires this result because petitioner would not deflect these sums to an independent corporation in an arm's-length transaction.[14] In 1974, petitioner simply shifted to Keller, Inc., the checks reflecting net income after withholding, but to which petitioner remained entitled. Petitioner has already reported $4,168.07 in

---

[12]This figure does not comport with the $44,000 figure which was contributed to the pension plan during the year. The residual amount, $19,174.20, was listed on Keller, Inc.'s return as a pension contribution carryforward.

[13]These figures do not reflect the passthrough of charitable contributions made by MAL, which were $17,160 and $26,664, respectively.

[14]See *Philipp Bros. Chemicals, Inc. (Md.) v. Commissioner*, 52 T.C. 240 (1969), affd. *Philipp Bros. Chemicals, Inc. (N.Y.) v. Commissioner*, 435 F.2d 53 (2d Cir. 1970), where income from a corporation's sales business was reported by a related corporation which engaged in no business activity. This Court sustained the Commissioner's sec. 482 allocation of the sales income to the corporation which actually earned it. This result also is required by application of the assignment of income doctrine under sec. 61(a). Due to the contractual arrangement, petitioner performed the supervisory services for MAL, Inc., in his individual capacity. Thus, petitioner was the "true earner" of this income and he, not Keller, Inc., must be directly taxed on it. *Roubik v. Commissioner*, 53 T.C. 365 (1969) (reviewed by the Court).

income (the gross compensation from MAL, Inc., less the net amount he received and reported as a "business loss"). As a consequence, $21,076.80, including the $4,168.07 already reported, from MAL, Inc., is reportable by and taxable directly to petitioner rather than Keller, Inc.

It is also our holding that no further adjustments for either year are necessary. We find that the aggregate compensation paid to or on behalf of petitioner was substantially proximate to the net amount of partnership income[15] and MAL, Inc., income which petitioner previously was receiving as an unincorporated practitioner, and in fact would have received from MAL and MAL, Inc., absent incorporation. These circumstances satisfy the section 482 arm's-length test. In this regard, not only should the pension plan contributions and medical expense reimbursement be included for purposes of determining the aggregate compensation paid (cf. *Edwin's Inc. v. United States*, 501 F.2d 675 (7th Cir. 1974) (contribution to pension plan considered in determining reasonable compensation under section 162)), but it also appears that the pension contributions are probably worth more to petitioner than any equivalent payment he would have received outright.[16]

For 1974, the aggregate compensation to or for petitioner of $84,213.25 ($55,000 in salary, $23,223.20 in pension plan contributions, and $5,990.05 in medical expense reimbursements) sufficiently approximates the net amount of taxable income petitioner previously was receiving from MAL: $83,730 (petitioner's distributive share of $96,533 for 1973 less $12,803 in contributions).[17] Similarly, we believe the same can be said for the year 1975 since the corresponding amount of aggregate compensation is $107,742.36 ($61,000 in salary, $43,000 in pension plan contributions, and $3,742.36 in medical expense reimbursements), and the figure for 1975, including MAL distributions and the MAL, Inc., income, is $105,685.82. Even

---

[15]By this we mean the distributive share of MAL income reduced by the appropriate share of the MAL charitable contributions.

[16]This results both from the exemption from tax for the earnings of a qualified plan's trust and the special tax benefits available on eventual distributions. See, e.g., the relevant provisions of secs. 401(a), 402, and 501(a).

[17]Since all of the MAL, Inc., income for 1974 has been held taxable to petitioner, we are considering only the income received from MAL in making this comparison.

though the compensation amounts for both years are less than the net income which petitioner would have received absent incorporation, $93,232[18] for 1974 and approximately $127,000 for 1975,[19] they are not so off-the-mark as to bespeak a non-arm's-length transaction. We have already noted that there is a significiant additional value to petitioner in any pension contributions, as opposed to an outright salary. Although petitioner's taxable income has been reduced, that reduction results from the Code provisions which specifically provide for deferral and nonrecognition of income. Moreover, it is also significant that Keller, Inc., was not able to utilize any of the MAL charitable contributions ($17,160 and $26,664 for 1974 and 1975, respectively). Any future benefit from the contributions will most likely be substantially lower than that which would have been available to petitioner individually because of Keller, Inc.'s small taxable income and the limitation of section 170(b)(2) (relating to corporate charitable deductions).

In relying on section 482 for the determination of this case, we do not ignore respondent's section 61(a) arguments based on the doctrines of lack of business purpose, substance over form, and assignment of income. See *Rubin v. Commissioner*, 51 T.C. 251 (1968), revd. 429 F.2d 650 (2d Cir. 1970). Rather, we find that the first two doctrines are inapplicable in this case and the third yields the same result as that mandated by section 482.

Respondent argues that the doctrines of lack of business purpose and substance over form require that petitioner be directly taxable on 100 percent of the income received by Keller, Inc. Respondent emphasizes the purported tax-avoidance motivations which prompted petitioner to effect an incorporation of his medical practice. In this vein, respondent characterizes the creation of Keller, Inc., as lacking in business purpose. In fact, it appears that respondent views petitioner's establishment of a pension plan as the primary

---

[18]This figure represents the net taxable amount petitioner would have received from MAL, a $110,392 distributive share less a $17,160 share of MAL contributions. Income from MAL, Inc., has not been considered for this year. See the preceding note.

[19]This figure is obtained by taking the 1975 distributive share from MAL, $133,842 less the $26,604 in contributions, and adding almost $20,000 in income from MAL, Inc., which approximates the amount for the previous year.

evil inherent in the incorporation of Keller, Inc. We reject, however, any proposition that the claimed manifestations of this avoidance, i.e., the establishment of medical reimbursement and pension plans, demonstrate such a pejorative purpose. See *Achiro v. Commissioner*, 77 T.C. 881 (1981).

The Code provisions relating to qualified retirement and medical plans are a deliberate congressional bestowal of benefits upon employers and e.nployees; efforts to obtain the advantages of these benefits, by way of conducting business in the corporate form, are not ;o be deemed to render the taxpayer culpable of illegal tax avoidance or evasion. See Worthy, "IRS Chief Counsel Outlines What Lies Ahead For Professional Corporations," 32 J. Tax. 88, at 90 (1970) (discussion of tax avoidance under section 269). Similarly, even if petitioner's desire to obtain the benefits of a medical reimbursement and a pension plan does not comprise a business purpose, petitioner's desire is immaterial because we have found that Keller, Inc., engaged in business activity. As to this point, we believe that the following words of the Supreme Court in *Moline Properties, Inc. v. Commissioner, supra* at 438–439, provide some insight:

Whether the purpose [of incorporating] be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity. [Fn refs. omitted.]

Respondent also argues that petitioner's formation of Keller, Inc., as well as his concurrent execution of an employment agreement with the corporation, constitute an anticipatory assignment of income to Keller, Inc. Respondent contends that petitioner was the actual "earner" of the income received from MAL and MAL, Inc., and thus, it is he who should be taxable on it. Respondent cites *Lucas v. Earl*, 281 U.S. 111 (1930); *United States v. Basye*, 410 U.S. 441 (1973); *Commissioner v. Culbertson*, 337 U.S. 733 (1949); *Jones v. Commissioner*, 64 T.C. 1066 (1975); *Roubik v. Commissioner*, 53 T.C. 365 (1969) (reviewed by the Court); and *Foglesong v. Commissioner*, T.C. Memo. 1976–294, revd. and remanded 621 F.2d 865 (7th Cir. 1980). Although respondent maintains that it is not Keller, Inc.'s classification as a corporation that is being

disputed, but rather the determination of the true earner of the instant income which is in issue, this distinction is largely semantic rather than substantive. Since respondent is attempting to shift to petitioner all of the income which Keller, Inc., reported, the effect would be to render Keller, Inc., a nullity for Federal income tax purposes.[20] See *Foglesong v. Commissioner, supra* at 869; *Rubin v. Commissioner*, 429 F.2d 650, 652 n. 3 (2d Cir. 1970). The policy favoring the recognition of corporations as entities independent of their shareholders requires that we not ignore the corporate form so long as the corporation actually conducts business. *Moline Properties, Inc. v. Commissioner, supra.*

In this case, Keller, Inc., clearly carried on the business of providing medical services. Here the facts as found reveal that Keller, Inc., was incorporated on December 3, 1973; that at that time petitioner and Keller, Inc., entered into an employment agreement; that Keller, Inc., was substituted as a partner of MAL with the consent of all of its partners; that petitioner was paid a regular salary from Keller, Inc.; that bank accounts were in Keller, Inc.'s name; and that Keller, Inc.'s name was substituted on the door of MAL's offices and on the consultation sheets and various other forms and correspondence letterheads.

Respondent, however, notes that Keller, Inc.'s offices were also the offices of MAL and MAL, Inc., both prior to and after its incorporation, that Keller, Inc., did not pay rent, purchase or own property, employ nurses, technicians or other clerical employees, incur any business indebtedness, pay interest, or loan any money. Respondent also stresses that petitioner's employment contract with Keller, Inc., did not contain a covenant not to compete, that petitioner guaranteed Keller, Inc.'s obligations to MAL, that petitioner failed to substitute Keller, Inc., for himself in his supervisory capacity over MAL,

---

[20]The Circuit Court in *Foglesong v. Commissioner*, 621 F.2d 865, 868 (7th Cir. 1980), revg. and remanding T.C. Memo. 1976–294, quotes with approval the following statement by Mr. Justice Holmes, speaking for the Supreme Court in *Klein v. Board of Supervisors*, 282 U.S. 19, 24 (1930), about the nature of corporations:

"But it leads nowhere to call a corporation a fiction. If it is a fiction it is a fiction created by law with intent that it should be acted on as if true. The corporation is a person and its ownership is a nonconductor that makes it impossible to attribute an interest in its property to its members."

Inc., until 1975, that the checks from MAL, Inc., as originally issued were drawn to the order of petitioner during 1974, and that Keller, Inc., did not receive a prorated portion of the income from MAL for 1973.

On this record we cannot say that Keller, Inc., failed to conduct business. Compare *Roubik v. Commissioner*, 53 T.C. 365 (1969) (reviewed by the Court). Certainly petitioner performed the only services for which Keller, Inc., was compensated, but it is axiomatic that a corporation can only perform services through its agents, whether it be a one-man corporation or an international conglomerate. The sine qua non is that there be created an employer-employee relationship between the corporation and such agents. We find that an employment relationship was created in this case by the employment agreement and that it was maintained by the parties to the agreement after the execution thereof.

The evidence also indicates that, for the most part, the corporation was respected as an independent entity providing medical services. Petitioner's guarantee of the corporation's commitments to MAL is an example of the respect shown for Keller, Inc., as an entity which had its own business obligations. Also, respondent's reliance on Keller, Inc.'s failure to own or lease equipment, hire employees other than petitioner, or pay other expenses ignores the nature of the pathology practice conducted by the MAL partnership. MAL received its supplies, equipment, and laboratory and personnel support from MAL, Inc., for which MAL, Inc., was compensated. Respondent's emphasis on this aspect of Keller, Inc.'s medical practice fails to demonstrate that the corporation was not in the business of providing medical services. Consequently, application of the assignment of income doctrine does not require an allocation to petitioner of all income received by Keller, Inc.

This case is unlike those which respondent brings to our attention. In *Roubik v. Commissioner*, *supra*, the individual taxpayers were taxed on the income reported by the corporation. The corporation did not enter into any arrangements to provide the services of its purported employees; personal contractual obligations between the taxpayers and the parties for whom they provided services persisted. *Jones v. Commissioner*, 64 T.C. 1066 (1975), presented a situation where a court

reporter was required by statute personally to prepare and sell transcripts. The corporation, therefore, could not legally perform the functions for which it was organized.

In *Foglesong v. Commissioner*, T.C. Memo. 1976–294, revd. and remanded 621 F.2d 865 (7th Cir. 1980), the taxpayer never entered into a written employment contract with his corporation; no written agreements were entered into between the corporation and the other parties to whom services were rendered until several years after incorporation; and four of the taxpayer's children received, over a 3-year period, $38,000 in dividends from preferred stock which cost them only $400. The assignment of income doctrine thus continues to be an essential tool in cases such as these where the corporation is not respected by the taxpayer/shareholders as a separate entity which carries on business activities.[21] See also *Rubin v. Commissioner*, 51 T.C. 251 (1968), revd. 429 F.2d 650 (2d Cir. 1970). It should be noted that the assignment of income doctrine applies to viable corporations in other contexts. For example, the anticipatory assignment of income prohibition of *Lucas v. Earl, supra*, requires that the income received by Keller, Inc., from supervisory services performed by petitioner for MAL, Inc., in 1974, be allocated to petitioner.[22]

The net effect of applying the assignment of income principles, thus, is the same, in this case, as applying section 482: petitioner is not directly taxable on all the income received by Keller, Inc. We believe that this similarity in result is more than mere coincidence. In section 482, Congress provided a mechanism for allocating income among related taxpayers. Respondent's regulations indicate that the purpose underlying section 482 "is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining, according to the standard of an uncontrolled taxpayer, the true taxable income from the property and business of a controlled taxpay-

---

[21]Sec. 482 analysis reaches the same result. Compare *W. Braun Co. v. Commissioner*, 396 F.2d 264 (2d Cir. 1968) (100-percent allocation denied because corporation from which income was sought to be allocated performed a business function) with *Philipp Bros. Chemicals, Inc. (N.Y.) v. Commissioner*, 435 F.2d 53 (2d Cir. 1970) (100-percent allocation sustained because corporation from which income was sought to be allocated was not respected by the taxpayers as a separate entity in the conduct of business).

[22]See note 14 *supra*.

er." Sec. 1.482–1(b)(1), Income Tax Regs. The Second Circuit has also made the following comments regarding that section:

The statute [section 482] rests on the well-settled policy that income is taxable under Section 61 of the 1954 Code to the party who earns it and that it is economic reality rather than legal formality which determines who earns income. Income-splitting devices designed to save taxes cannot be used to undermine the established principle that income is to be taxed to its real owner. *Gregory v. Helvering*, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935). [*Philipp Bros. Chemicals, Inc. (N.Y.) v. Commissioner*, 435 F.2d 53, 57 (2d Cir. 1970).]

See also *Rubin v. Commissioner,* 56 T.C. 1155, 1161 (1971) (reviewed by the Court), affd. per curiam 460 F.2d 1216 (2d Cir. 1972). Section 482, and the regulations pursuant thereto, provide a detailed mechanism to deal with the tax-avoidance problems which spur the assignment of income doctrine. Section 482 and the assignment of income doctrine, therefore, should not lead to different results in this case.

A final point needs mention. In advancing his arguments under sections 61(a) and 482, respondent also attacked Keller, Inc.'s use of a November 30 fiscal year. However, Keller, Inc., is not before the Court and we doubt whether, in any event, this presents a problem to be analyzed in the context of this case under section 61(a) and section 482. Respondent does not demonstrate that the initial adoption by Keller, Inc., of a November 30 fiscal year constituted a "change" within the intendment of section 706(b)(2), and we leave for another day the determination of whether that section mandates the continuation by a substituted partner (e.g, Keller, Inc.) of the transferor partner's taxable year: here, the calendar year of petitioner. Since Keller, Inc., was a new taxpayer, under the usual rules, it was free to adopt any taxable year it desired so long as the requirements of section 441 were satisfied. See sec. 1.441–1(b)(3), Income Tax Regs. Respondent does not advance any contrary argument.

To reflect the foregoing,

*Decision will be entered under Rule 155.*

Reviewed by the Court.

WILBUR, *J.*,dissenting: Petitioner was engaged with 11 other pathologists in a full service pathology practice, from hemotology to bacteriology, including cytology, endocrine studies, surgical pathology, and other fields of the practice. The practice averaged from 20,000 to 25,000 tissue examinations a year and between 75,000 and 80,000 cytology examinations, each accompanied by a corresponding report. There were various other clinical pathology and consultation reports, ranging between 300 and 1,000 per day. The practice served various primary care physicians and several hospitals.

The business was conducted by the pathologists through well-equipped laboratories, principally at two different locations, and incidentally at various hospitals. The labs were staffed by from 30 to 50 employees, including many highly trained technicians. The laboratories and the equipment belonged to MAL, Inc., a corporation owned by petitioner and his fellow pathologists. The technicians and clerical help, though working for and with the pathologists, were technically employees of MAL, Inc. The pathologists themselves formed a partnership (MAL) that handled all the billing and collections, and entered into all the contracts with the hospitals served. The partnership billed for these procedures, and reimbursed the corporation for use of their laboratory facilities and employees.

Sometime prior to 1974, the partners engaged in extensive discussions about whether to form a professional corporation, incorporating the partnership slice of the business, but turned this down. Although the partners declined to incorporate the partnership slice of the business, petitioner nevertheless created a professional corporation under Oklahoma law (Keller, Inc.). This corporation entered into agreements with the incorporated laboratory facilities (MAL, Inc.) and the partnership (MAL). The agreement between petitioner and the partnership "substituted" his corporation as a partner but

required petitioner to "personally guarantee all obligations arising out of the relationship between the partnership and Dan F. Keller, M.D., Inc." The net effect of these agreements entitled Keller, Inc., to receive petitioner's share of the income earned by the collective efforts of the partnership in providing comprehensive pathology services through its contracts and contacts, and also to receive the salary petitioner earned for his efforts in supervising the laboratory facilities and procedures of MAL, Inc.[1]

In his opening statement, petitioner's counsel conceded that these arrangements were not simple and might be unusual. He also asserted that "the evidence will show that Keller, Inc. owned no medical supplies, owned no office furniture, had no technical medical equipment, employed no medical technicians, employed no nurses." The evidence showed this and more. On the particular facts before us, I agree with respondent that petitioner earned his share of the income (was the "true earner" of the income) and simply assigned it to a corporate shell he created.

Prior to the formation of petitioner's corporation, the comprehensive pathology practice or business was artificially sliced in two—with one integrally related half relegated to a corporation (MAL, Inc.), the other to a partnership (MAL)—both of them owned and controlled as to all essential details by the partners. The addition of petitioner's corporation is one slice too many, tissue paper thin, without functional reality or economic substance. The corporation was a small and barely discernible shadow on a thin edge of the partnership—and the partnership controlled every essential element of the business. Indeed, along with MAL, Inc., it was the business. The particular facts and circumstances before us bring this case within *Roubik v. Commissioner*, 53 T.C. 365 (1969), wherein we stated:

Pfeffer Associates appears to have existed during 1965 as a mere set of bookkeeping entries and bank accounts. It did not enter into any arrangements to provide the service of its "employees" to any of the institutions, doctors, etc., for whom petitioners provided services. It did not own any

---

[1]Keller, Inc., was substituted for petitioner as a member of the board of directors of MAL, Inc. The salary for petitioner's efforts continued to be paid to him by check for a period of time, but subsequently, the checks were made out directly to petitioner's corporation.

equipment, incur any debts for rent, office or medical supplies or services or for salaries, except for the salaries of the petitioners. The only "shared" expense, i.e., the only expense which was incurred jointly by the petitioners was $45 a month for the time Ramin's Hampton office secretary devoted to maintaining records of income and expenses received and paid by Pfeffer Associates. The maintenance of these records for tax purposes appears to be the only real business activity engaged in by the corporation. * * * [53 T.C. at 379.]

See also *Rubin v. Commissioner*, 51 T.C. 251 (1968), revd. and remanded 429 F.2d 650 (2d Cir. 1970), decided on remand 56 T.C. 1155 (1971), affd. 460 F.2d 1216 (2d Cir. 1972).

The same and more may be said of petitioner and his corporation. Keller, Inc., "did not own any equipment, incur any debts for rent, office or medical supplies or services or for salaries, except the salaries of the petitioner." It had no expenses—petitioner continued to practice with the same facilities at the same locations owned or leased by MAL and MAL, Inc.

It had no medical records, business records, or any other item or paraphernalia of business of any kind whatsoever. It supervised no employees and had no contracts with hospitals or contacts with primary care physicians—these all belonged to and were completely controlled by MAL. "The maintenance of these records for tax purposes appears to be the only real business activity engaged in by the corporation."[2]

The partnership has both the contracts with the hospitals and the contacts with other customers. The partnership establishes every essential element of the business—from fees charged and customers served to the division of the income among the 11 partners in accordance with the partnership agreement. The partners, using the adjunct facilities, equipment, and employees of MAL, Inc., earned this income by providing comprehensive pathological services to all of its customers.

A very brief and legally ambiguous agreement with the partners of MAL, whereby petitioner's corporation "was substituted in [his] place" in the partnership, did not change

---

[2]And precious few records there were, for the only assets shown on Keller, Inc.'s fiscal 1976 franchise return were $4,658.85 in cash and an unspecified intangible asset listed at $240. And under "statement of business," the only entry was the $86,981.97 paid to Dr. Keller.

any of these basic facts—it simply provided a vehicle for assigning petitioner's share of the fruits of the partnership enterprise to his corporation. Indeed, the agreement itself suggests all the parties (the partners) viewed it this way, because the agreement specifically required petitioner "to personally guarantee all obligations arising out of the relationship between Keller, Inc., and the partnership." In other words, the partners were willing to transfer petitioner's share of the earnings to his corporation, but as to the basic partnership arrangement—particularly any of petitioner's obligations to the other partners—they looked in the final analysis to petitioner, and he agreed.[3]

As to MAL, Inc., petitioner continued to receive checks made out to him for his services and reported them on his income tax return for 1974, taking a corresponding deduction. Subsequently, a change was made and the checks were issued directly to his corporation. The majority opinion taxes petitioner on his salary from MAL, Inc., prior to this perfunctory mechanical change and taxes his corporation on the salary after this perfunctory mechanical change. I have difficulty drawing this dividing line. All of the stock of MAL, Inc., continued to be owned by petitioner and his partners. Again, these partners owned and controlled MAL, Inc., which was functionally a closely integrated, if not indivisible, part of their comprehensive pathology business. They determined all of the operations of MAL, Inc., as surely as they did MAL, both before and after creation of petitioner's shell corporation. Substituting Keller, Inc., for petitioner as a director (hardly the typical role for a professional corporation) effected no real change in any of this.

The partnership controlled all of the elements that determined the income earned by the collective efforts of the partners. Petitioner was subject to these constraints to the

---

[3]And to some extent, this particular provision may have been redundant, for despite the interposition of this corporate shell, it seems probable on the facts herein that petitioner remains personally liable as a partner for the wrongful acts of his partners in the course of partnership business and vice versa. Partners are jointly and severally liable for a tort committed in the course of partnership business (see Okla. Stat. Ann. tit. 54, secs. 213, 215 (West 1969); 60 Am. Jur. 2d Partnership sec. 102). It is doubted petitioner's transparent arrangements would be sufficient to circumvent this rule, particularly in view of his continuing obligations to his partners. It is hard to see, then, in what sense petitioner's corporate bankbook is a partner.

same extent as the other partners, and he remained personally liable to the partnership in fulfilling his obligations as a partner. He simply assigned his share of the earnings and his salary from the corporation (MAL, Inc.) to his corporate shell. Keller, Inc., was "nothing more than a few incorporating papers lying in a desk drawer of no significance except when a tax return is due." *Foglesong v. Commissioner*, 621 F.2d 865, 873 (7th Cir. 1980) (Wood, J., dissenting), revg. and remanding a Memorandum Opinion of this Court. Its functional relationship to the comprehensive pathology enterprise represented by the MAL partnership and MAL, Inc., was simply as a bank account into which petitioner's salary from MAL, Inc., and his share of the income from the partnership was funneled. Here the attenuated subtleties triumph over economic substance and practical reality, and form and artifice reclaim center stage of our tax laws.

The majority opinion produces strange results indeed, for as I read it, each individual partner could incorporate. We would have MAL, Inc., at the center surrounded by the partnership and 11 corporate arms extending out in different directions, each a hollow prosthetic device without offices, a laboratory, equipment, facilities, employees, medical records, or any other items normally used in the practice of pathology. The sole function of this paper octopus would be to serve as an incorporated pocketbook, enabling each physician to have a pension plan and fringe benefit package tailored to his own preferences without regard to the quite different preferences of each of his partners and whether or not the employees of the business were provided anything at all.[4] After this decision, anyone may form a corporation, paper the file a little, and market his services with his salary being paid to his corporation. If Dr. Keller can do this, so can the technicians of MAL,

---

[4] For the years in question, neither sec. 414(b) or (c) or the applicable decisions would interfere with this. See *Garland v. Commissioner*, 73 T.C. 5 (1979), and *Kiddie v. Commissioner*, 69 T.C. 1055 (1978). For plan years subsequent to 1980, sec. 414(m) would appear to circumscribe the discrimination involved as to pensions, and sec. 105(h)(8) as to medical reimbursement. This simply demonstrates that each time Congress has spoken, it has unmistakably expressed its displeasure at the transparent manipulations involved. For the years in issue, the majority holding also permits petitioner (through his medical reimbursement plan) to funnel his share of net fees through his corporate shell, insulating him from the 3-percent floor on medical deductions so nettlesome to the patients who paid these fees.

Inc., working by his side. And nurses, teachers, pilots, truck drivers, and virtually any other employee one can think of, for this is the logical and practical consequence of the majority opinion. This may be a good idea, but I never thought it was the law until today.

Petitioner suggests that, in applying the assignment of income doctrine to professional corporations, respondent is renewing an attack on one-man professional service corporations that was lost long ago. Unfortunately, as the following statement from the majority opinion makes clear, the majority has subscribed to petitioner's theory:

Although respondent maintains that it is not Keller, Inc.'s *classification as a corporation* that is being disputed, but rather the determination of the true earner of the instant income which is in issue, this distinction is largely semantic rather than substantive. * * * [Emphasis supplied.]

The net effect is to subtly raise the spectre that the Service in this case is again attacking the proper classification of professional service corporations.

This is simply not so, as a brief review of history will show. A service business could always incorporate, but the incorporation of a professional service business presented unique ethical and policy problems. The States resolved the problems by permitting the incorporation of a professional practice or business, subject to certain constraints, the most important preserving individual liability for malpractice. This greatly restricted the limited liability normally associated with the corporate form.[5] After considerable litigation over the proper classification of these organizations, the Service in Rev. Rul. 70–101, 1970–1 C.B. 278, conceded they were corporations. But that concession, like the cases litigated and the professional service corporation statutes enacted, focused on the incorporation of a professional business—a physician or several physicians incorporating their practice, with the assets, contracts, goodwill, books and records, accounts receivable and payable, medical facilities, equipment and supplies, physical facilities,

---

[5]For example, Okla. Stat. Ann. tit. 18, sec. 812 (West Cum. Supp. 1980) provides:

Sec. 812. Professional relationship preserved

This act does not alter any law applicable to the relationship between a person rendering professional services and a person receiving such services, including liability arising out of such professional services.

and employees normally associated with that practice. As to these organizations, the dust has settled, and any further changes—if any are appropriate—will have to emanate from Congress. Respondent's concession clearly was confined to that type of creature, for he specifically stated in Rev. Rul. 70–101:

> A professional service organization must be both organized and operated as a corporation to be classified as such. See *Jerome J. Roubik and Joan M. Roubik, et al., v. Commissioner*, 53 T.C. 365, No. 36 (1969).
>
> \*     \*     \*     \*     \*     \*     \*
>
> The foregoing position relates solely to the issue of the tax classification of professional service organizations. Professional service organizations classifiable as corporations are subject to audit to the same extent as other corporations, and nothing contained herein is to be construed as waiving the assertion of any issues against such organizations other than that of classification. [1970–1 C.B. 278, 280.]

Plainly, we here confront an entirely different creature within this unmistakably clear reservation by respondent. For Keller, Inc., is not a professional business, but a piece of a piece of this, incorporated into an empty shell having none of these features and no practical control over the earning of the income by the business. When each professional becomes a paper corporation that in turn becomes a partner in a partnership conducting the ongoing business (whether the assets, facilities, employees, etc. are attached to that partnership or farmed out to still another corporation) we have an entirely new phenomenon. As any lawyer knows, quite different legal questions arise in many areas of law—corporations, partnerships, contracts, torts, taxes.[6]

The tax consequences of using multiple professional service corporations that are little more than empty shells as partners in an ongoing professional business has simply not been squarely presented to the courts. There is no reason to hold that these new creatures are immune from the assignment of income doctrine. Assuming that Keller, Inc., is *not* a sham (as

---

[6]See note 3 *supra*. As to taxes, the incorporation of a going professional business (with assets, employees, and other normal business paraphernalia), or its liquidation or reorganization raises many of the typical issues normally raised under subch. C of the Internal Revenue Code. Empty shells like *Keller* have no assets or liabilities, and to the extent they are mere conduits, they will (aside from money in a pension trust) simply contain cash equal to the basis of the taxpayer's stock. Assuming they are used as a conduit, and not to also shield income from progressive tax rates, the corporate tax problems are not really much greater than they are with any other bank account.

the majority must—not without uncommon faith—to reach the result it does), then the income may have been earned *either* by the corporation *or* by Dr. Keller. Mere existence— either of Mrs. Earl or petitioner's corporation—does not carry automatic immunity from the assignment of income doctrine. As the prior discussion clearly demonstrates, under the facts here present, Dr. Keller earned the income and assigned it to his corporation, and there is no immutable rule of law to the contrary. It is clear that income may be assigned to a corporation or to a trust or an individual. (See *United States v. Basye*, 410 U.S. 441 (1973); *Rubin v. Commissioner*, 51 T.C. 251 (1968), revd. and remanded 429 F.2d 650 (2d Cir. 1970), decided on remand 56 T.C. 1155 (1971), affd. 460 F.2d 1216 (2d Cir. 1972); *Roubik v. Commissioner, supra; Jones v. Commissioner*, 64 T.C. 1066 (1975); and *Vnuk v. Commissioner*, 621 F.2d 1318 (8th Cir. 1980)).[7]

The hornbook law on assignment of income was set out by Justice Holmes in *Lucas v. Earl*, 281 U.S. 111 (1930), when he stated:

But this case is not to be decided by attenuated subleties. It turns on the import and reasonable construction of the taxing act. There is no doubt that the statute could tax salaries to those who earned them and provide that the tax could not be escaped by anticipatory arrangements and contracts however skillfully devised to prevent the salary when paid from vesting even for a second in the man who earned it. That seems to us the import of the statute before us and we think that no distinction can be taken according to

---

[7]In *Vnuk v. Commissioner*, 621 F.2d 1318 (8th Cir. 1980), a physician partner (a radiologist) purported to be employed by a trust he created. The trust had other property and its reality was not challenged (although it was *also* held that the grantor trust rules applied). In holding the assignment of income doctrine applicable, the Eighth Circuit stated:

"Here, it is clear that the 'ultimate direction and control' [over the earning of the compensation] rested in the taxpayer and not in the Trust. While the taxpayer may have conveyed, at least in *form*, his services to the Trust, he was not in *substance* a bona fide servant of the Trust. * * * [621 F.2d at 1320. Emphasis added.]"

See also *Vercio v. Commissioner*, 73 T. C. 1246 (1980). On the *assignment of income* issue alone, I find it very difficult to reconcile the line of decisions of which *Vnuk* and *Vercio* are a part with the decision of the majority herein. For in "substance" as opposed to "form" it is quite clear that the same can be said of Dr. Keller. He was not a bona fide employee of the corporation. The corporation did not supervise his employment (unless Dr. Keller, as sole shareholder, director, and president supervised himself), nor in any way control the amount of money earned by the collective efforts of the pathologists here involved or the pro rata portion thereof attributable to Dr. Keller. But as the majority has already told us, in this area form always equals substance.

the motives leading to the arrangement by which the fruits are attributed to a different tree from that on which they grew. [281 U.S. at 114–115.]

During the last half century since *Lucas v. Earl,* we have been repeatedly advised of the fundamental rule that income must be taxed to him who earns it; indeed, the Supreme Court has referred to the assignment of income rule as "the first principle of income taxation." *Commissioner v. Culbertson,* 337 U.S. 733, 739 (1949); *United States v. Basye, supra.* See Lyon and Eustice, "Assignment of Income: Fruit and Tree as Irrigated by the P. G. Lake Case," 17 Tax L. Rev. 295 (1962). That the majority chose to ignore this may explain why it also holds that the assignment of income doctrine, for all practical purposes, is inapplicable to these creatures if they pass the *Moline Properties*[8] threshold and "actually conduct business." This is, to me, an extraordinary proposition, entirely inconsistent with both the long evolution of the assignment of income theory and its present status. Recently, the Supreme Court has said the following on this subject:

The principle of Lucas v. Earl, that he who earns income may not avoid taxation through anticipatory arrangements no matter how clever or subtle, has been repeatedly invoked by this Court and stands today as a cornerstone of our graduated income tax system. See, *e.g.,* Commissioner of Internal Revenue v. Harmon, 323 U.S. 44 (1944); United States v. Joliet & Chicago R. Co., 315 U.S. 44 (1942); Helvering v. Eubank, 311 U.S. 122 (1940); Burnet v. Leininger, 285 U.S. 136 (1932). And, of course, that principle applies with equal force in asessing partnership income. [*United States v. Basye, supra* at 450, 451.] [9]

Some of the earliest analyses of the problems presented by

---

[8]*Moline Properties, Inc. v. Commissioner,* 319 U.S. 436 (1943).

[9]It seems very strange for this Court to follow the lead of the Second Circuit, which denigrated the assignment of income doctrine as one of the "common law principles of taxation." *Rubin v. Commissioner,* 429 F.2d 650, 653 (2d Cir. 1970), revg. and remanding 51 T.C. 251 (1968), decided on remand 56 T.C. 1155 (1971), affd. 460 F.2d 1216 (2d Cir. 1972). Not only is it surprising to deal with a half century of Supreme Court decisions so cavalierly, but it is clear that Congress has, as is often the case, assumed that the assignment of income doctrine is a fundamental principle of tax law around which the statute is shaped. The trust and partnership provisions codify assignments of income principles, and Congress has often clearly stated in legislative history that it is predicating the law on these first principles. See secs. 671–678; sec. 704(e); H. Rept. 1337, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess. 63 (1954); S. Rept. 1622, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess. 86 (1954); H. Rept. 586, 82d Cong., 1st Sess. (1951), 1951–2 C.B. 357, 380–381; S. Rept. 781, 82d Cong., 1st Sess. (1951), 1951–2 C.B. 458, 485–487. See also sec. 1375(c) and the regulations thereunder. This integration of statutory provisions and judicial decisions is quite common to tax law—note, for example, the historical evolution of the tax benefit rule judicially and

professional service corporations, although focusing on their proper classification, clearly pointed out that these associations, in appropriate circumstances, would be subject to the assignment of income doctrine. See Bittker, "Professional Associations and Federal Income Taxation: Some Questions and Comments," 17 Tax L. Rev. 1, 5 n. 8 (1961). The case before us presents the appropriate circumstances. We do not have a professional corporation operating a going professional business owned by one or more practitioners. Rather, we have a professional corporation that is nothing more than an empty paper shell with none of the attributes of an ongoing business, and that corporation is serving as a partner. Here it is the partnership (combined with MAL, Inc.) that is conducting the ongoing business with all of its attributes, that is controlling all of the essential elements through which the partnership collectively earns the income—including the pro rata share attributable to Dr. Keller's services and assigned to his corporation. As between the collection of meaningless paper going by the name of Keller, Inc., and Dr. Keller, can there be any doubt on the facts before us who is the true earner of the income at issue? My answer to that is Dr. Keller, and I would apply the assignment of income doctrine to directly tax him on the income earned.[10]

Finally, it isn't just that the majority gives the wrong answer to this question—the majority opinion also leaves the precedent in a state of confusion. I believe we have an obligation to establish a clear and consistent body of precedent that enables lawyers to determine our views on a particular issue with a reasonable expenditure of effort. We were reversed in *Rubin v. Commissioner*, 51 T.C. 251 (1968), revd. and remanded 429 F.2d 650 (2d Cir. 1970), and told to eschew such inconsequential common law principles of taxation as the

---

legislatively. See sec. 111 and *Dobson v. Commissioner*, 320 U.S. 489, 506 (1943); *Alice Phelan Sullivan Corp. v. United States*, 180 Ct. Cl. 659, 381 F.2d 399 (1967); *Putoma Corp. v. Commissioner*, 66 T.C. 652, 664 n. 10 (1976), affd. 601 F.2d 734 (5th Cir. 1979).

[10]The majority tells us (surely with tongue in cheek) that "The net effect of applying the assignment of income principles, thus, is the same, in this case, as applying section 482: petitioner is not directly taxable on all the income received by Keller, Inc." Since, if the assignment of income doctrine applies, precisely the opposite is true—petitioner will be directly taxed on all the income—this statement is patently false. And obviously for many reasons the results are not the same, but dramatically different, and that is what this case is all about.

assignment of income doctrine in favor of section 482. In view of the directions of the Second Circuit in that particular case, we applied section 482 on remand. *Rubin v. Commissioner*, 56 T.C. 1155 (1971), affd. 460 F.2d 1216 (2d Cir. 1972).

In dismissing the assignment of income doctrine and applying section 482, we follow both the language and procedure of the Second Circuit in *Rubin*, but we go a good deal further. Floating alone on a sea of contrary precedent, the opinion of the Second Circuit reversing our decision in *Rubin* is the only source of the unique doctrine propounded by the majority today.[11]

How the majority can announce this new doctrine without overruling our *Rubin* decision is difficult for me to see. Not only does the majority avoid this, it never even directly cites the Second Circuit's *Rubin* opinion. (The most we get is "see" or "see also *Rubin*.") And what is the Court's view regarding *Foglesong v. Commissioner*, 621 F.2d 865 (7th Cir. 1980), revg. and remanding a Memorandum Opinion of this Court? I believe we have an obligation to those who rely on our precedents to forthrightly tell them what we are about— whether or not we are overruling *Rubin* and whether or not we are following the reversal of the Seventh Circuit in *Foglesong*. Either our opinions in *Rubin* and *Foglesong* are right or the opinion in this case is right—they cannot stand together.

FAY, DAWSON, SIMPSON, IRWIN, and CHABOT, *JJ.*, agree with this dissenting opinion.

---

[11]And plainly, we will sooner or later be confronted with arrangements between professionals and corporations for which sec. 482 will be inadequate, and the decision today to so lightly discard the assignment of income doctrine will come home to roost.