T.C. Memo. 1996-450


UNITED STATES TAX COURT


THEODORE SOURIS, P.C., A DISSOLVED CORPORATION,
AND THEODORE SOURIS, AS SUCCESSOR IN INTEREST
OF THEODORE SOURIS, P.C., Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 639-95.                    Filed October 2, 1996.


<u>Patricia D. White</u>, for petitioners.

<u>Meso T. Hammoud</u>, for respondent.


MEMORANDUM OPINION


RAUM, <u>Judge</u>:  The Commissioner determined a $48,905

deficiency in petitioner corporation's 1988 income tax together

with a $9,781 section 6661(a)[1] addition to tax for that year.

---

[1] Unless otherwise indicated, all section references are to
                                        (continued...)

The principal issue presented is whether the petitioner corporation's $171,476 "employer reversion", section 4980(c)(2)(A), which is concededly includable in its gross income, may be offset by a section 162(a)(1) deduction in the same amount for compensation paid to its sole stockholder-employee. The facts have been stipulated.

In 1981, Theodore Souris, an attorney, was a partner in the Detroit, Michigan, law firm of Bodman, Longley & Dahling. On April 16, 1981, petitioner Theodore Souris, P.C., was incorporated under the laws of Michigan. It was wholly owned by Mr. Souris. Also on that day, Mr. Souris assigned his partnership interest to petitioner corporation (the corporation or the P.C.), and the law firm consented to its admission as a partner in substitution for Mr. Souris. An appendix to the partnership agreement sets forth special provisions regarding professional corporations as partners. Among other things, the appendix provides that no one other than the individual attorney "shall at any time be a stockholder, director, officer or lawyer employee of the professional corporation", that "the professional corporation shall be entitled, without deduction, to all the receipts of the individual attorney," and that "the individual attorney shall guarantee to the Firm that the professional

---

[1](...continued)
the Internal Revenue Code in effect for the year at issue.

corporation will perform all its obligations as a partner in the Firm."  In the foregoing assignment by Mr. Souris of his partnership interest to his P.C., Mr. Souris in fact guaranteed "to the Firm that Theodore Souris, P.C. will perform all its obligations as a partner in the Firm."

On August 27, 1981, Mr. Souris entered into an employment agreement with his P.C.  He was to be paid a salary of a fixed amount plus a bonus in an amount "determined by the Corporation's Board" to make his total compensation "equal to the reasonable value of his services."  The "Corporation's Board", as indicated above, was none other than Mr. Souris himself.  The agreement provided further that the P.C. would adopt a pension plan and a profit sharing plan for the "Employee" as well as make provision for his health and disability insurance and "such other fringe benefits as the Board  shall approve."  The agreement was signed for the P.C. by Mr. Souris as president and by Mr. Souris acting on his own behalf as the employee.

On September 1, 1981, the corporation adopted the Theodore Souris, P.C. Pension Plan and Trust.  The plan was a defined benefit plan.  As stipulated by the parties, it was "duly qualified under the applicable provisions of the Internal Revenue Code."  Mr. Souris was the sole plan participant.

Until August 31, 1987, the P.C. had a fiscal year ending August 31.  However, beginning with the short year ending December 31, 1987, it changed to a calendar year basis.

The plan was terminated on March 31, 1988, and liquidated as of December 31, 1988.  The P.C. itself was dissolved on October 26, 1988.  Upon the plan's liquidation, its assets in the amount of $1,339,511 were distributed.  Of this distribution, $1,168,035 was rolled over to an Individual Retirement Account established for the benefit of Mr. Souris.  The remaining $171,476 was ineligible to be rolled over, and appears to be attributable to overfunding the plan over the years due to what turned out to be erroneous actuarial assumptions.  Thus, as stipulated by the parties, that $171,476 "represented excess Plan assets which reverted back to the Corporation."  The reversion was not reported by the corporation in its 1988 return.  However, in the 1988 joint individual income tax return filed by Mr. Souris and his wife, the reversion was reported as "other" or "miscellaneous" income, which was explained in that return as "Theodore Souris P.C. Pension Plan Reversion".

In the notice of deficiency the Commissioner determined that "Theodore Souris, P.C. received $171,476 as a taxable reversion from the Theodore Souris, P.C. Pension Plan and Trust during the taxable year ended December 31, 1988."  The Commissioner

accordingly recomputed the corporation's taxable income by including the $171,476 reversion in its gross income.

Both petitioner corporation and respondent now agree that the $171,476 should have been reported as gross income by the corporation in its 1988 return. However, the corporation does contend that there was no resulting deficiency since its $171,476 taxable reversion income was fully offset by a deduction in the same amount under section 162(a)(1) by reason of its contractual obligation to Mr. Souris to pay him that $171,476 as compensation for services rendered.

We begin our analysis of this case with a sense of unreality. There are before us Theodore Souris, P.C., and Mr. Souris, the individual. Mr. Souris was the sole stockholder; he was the sole officer-employee of the corporation; he was the sole member of its Board of Directors; and he was the sole participant in the P.C.'s pension plan. The record contains no evidence that anyone other than Mr. Souris held any office in, or played any part whatsoever in, the affairs of the corporation or the plan or served as trustee if in fact there was a trust. In this connection, this case is sharply distinguishable from Greenlee v. Commissioner, T.C. Memo. 1996-378, where the trustee was an independent bank and where the transaction in question was "independently approved" by the Trust Investment Committee of the bank--a circumstance that the Court emphasized and considered

crucial.  To speak of an agreement between Mr. Souris and his P.C. authorized by its Board is to engage in discourse in a never-never land.  In the real world there was only Mr. Souris dealing with himself.[2]  Yet it has been well recognized that we must accept such arrangements as real,[3] and indeed the IRS has treated the corporation as an independent entity that was engaged in the transactions involved as though conducted at arm's length.  Moreover, although not specifically so articulated in the record, it seems highly likely that the incorporation of the P.C. here was intended to reduce Mr. Souris' taxes through the pension

---

[2]  The predicament with which the Lord Chancellor was faced in Gilbert and Sullivan's Iolanthe, although in an entirely different context, suggests a strikingly similar situation.  The Lord Chancellor explained his predicament as follows:

> The feelings of a Lord Chancellor who is in love with a Ward of Court are not to be envied.  What is his position?  Can he give his own consent to his own marriage with his own Ward?  Can he marry his own Ward without his own consent, can he commit himself for contempt of his own court?  And if he commit himself for contempt of his own court, can he appear by counsel before himself, to move for arrest of his own judgment?  Ah, my Lords, it is indeed painful to have to sit upon a woolsack which is stuffed with such thorns as these!  [The Complete Plays of Gilbert and Sullivan, p. 248.]

[3]  Moline Properties, Inc. v. Commissioner, 319 U.S. 436 (1943); cf. Burnet v. Commonwealth Improvement Co., 287 U.S. 415 (1932).  In National Carbide Corp. v. Commissioner, 336 U.S. 422, 433 (1949), the Supreme Court stated:

> Undoubtedly the great majority of corporations owned by sole stockholders are "dummies" in the sense that their policies and day-to-day activities are determined not as decisions of the corporation but by their owners acting individually.   * * *

plan. And such purpose would not appear to be fatal in these circumstances, since this Court has held that where the corporation was established to provide a pension plan for its sole stockholder there was a sufficient business purpose to justify giving full effect to the arrangement. Keller v. Commissioner, 77 T.C. 1014, 1029-1030 (1981), affd. 723 F.2d 58 (10th Cir. 1983).

Accordingly, it is incumbent upon us to decide this case as though we were dealing with an autonomous corporation and with its independent employee, Mr. Souris. In that context we agree with petitioner corporation and hold that there was no deficiency in its 1988 income tax.

Preliminarily, there is no dispute that under Michigan law, even though petitioner corporation was dissolved, it remained in existence for the purpose of winding up its affairs and continued to function in the same manner as if dissolution had not occurred. Mich. Comp. Laws Ann. sec. 450.1833 (West 1970); cf. United States v. Adams Bldg. Co., 531 F.2d 342 (6th Cir. 1976). However, upon the P.C.'s dissolution, the Board of Directors (i.e., Mr. Souris) resolved that Mr. Souris would be the successor plan sponsor of the P.C.'s "Employees' Pension Plan". Moreover, as indicated by the caption itself in this case, Mr. Souris individually is the "successor in interest of Theodore Souris, P.C." Since the corporation had already been dissolved

when the excess pension funds reverted to the corporation, Mr. Souris received the $171,476 reversion in his capacity as successor in interest of the corporation.  Under the terms of the employment agreement between Mr. Souris and the P.C., the corporation, or Mr. Souris standing in its place as successor, was required to pass that $171,476 to himself as the employee-beneficiary.

To understand the situation more fully, we must delve deeper into the morass resulting from Mr. Souris' 1981 employment agreement with his wholly owned corporation, the P.C.  Pursuant to that agreement the P.C.'s earnings from the law partnership may be considered as separated in the P.C.'s hands into three parts payable in the aggregate to or for the benefit of Mr. Souris:  (1) Compensation in a fixed amount, (2) bonus in the amount of whatever remains after (3) payments into the pension plan for Mr. Souris.  But the amount payable into the pension plan was limited by section 404, and that limit was exceeded here by reason of excessive employer contributions to the plan due to what turned out to be faulty actuarial assumptions.  Accordingly, to the extent that such amounts were excessive, the excess automatically increased the bonus payable to Mr. Souris as the employee under his 1981 agreement with his P.C.  But, as noted above, it was first paid to him as successor in interest of the

corporation, standing in its shoes, as an "employer reversion"--a term that is defined in section 4980(c)(2) as follows:

> The term "employer reversion" means the amount of cash and the fair market value of other property received (directly or indirectly) <u>by an employer</u> from the qualified plan.  [Emphasis added.]

Then, in his capacity as successor in interest of his employer, Mr. Souris passed that employer reversion to himself as the employee pursuant to the 1981 employment agreement.  To be sure, these steps were telescoped into a single payment to Mr. Souris, who mistakenly reported the reversion in his individual return rather than amending the corporate returns and then reporting the same amount as additional compensation on his individual return. However, Mr. Souris' failure to follow this procedure in separate steps does not detract from the essence of the situation if we are to treat the corporation and Mr. Souris as separate taxpaying entities, as we are required to do.

We conclude that the $171,476 reversion represents additional compensation (increased bonus) paid by the corporation.  Further, the corporation's income from the law partnership was equal to the value of Mr. Souris' services, and, as passed through to him by the corporation, it became the basis for a deduction by the corporation under section 162(a)(1)[4] as "a

---

[4]  Sec. 162.  Trade or business expenses.

> (a)  In general.--There shall be allowed as a
>                                        (continued...)

reasonable allowance for * * * compensation for personal services actually rendered".  There is no dispute between the parties that the amount was "reasonable".

The Government challenges the argument that the reversion was paid to Mr. Souris as compensation.  It contends that the reversion, being gross income to the corporation, was paid to Mr. Souris as a constructive dividend, which, although representing taxable income to Mr. Souris, was not deductible by the corporation.  And the Government relies upon the well-established line of cases holding that to be deductible as compensation the payment must be "made with the intent to compensate".  Paula Constr. Co. v. Commissioner, 58 T.C. 1056, 1058 (1972), affd. without published opinion 474 F.2d 1345 (5th Cir. 1973); King's Court Mobile Home Park, Inc. v. Commissioner, 98 T.C. 511, 514 (1992).  The argument is superficially persuasive here since the payment was not reported by Mr. Souris as compensation; he instead described the payment merely as a "reversion".  However, the argument falls apart upon further reflection.  As was indicated above, Mr. Souris obviously, but mistakenly, reported

---

[4](...continued)
        deduction all the ordinary and necessary
        expenses paid or incurred during the taxable
        year in carrying on any trade or business,
        including--

                (1) a reasonable allowance for salaries
                or other compensation for personal
                services actually rendered;

the payment in his own income tax return, rather than in the return of the corporation, as a "reversion". The real intent of the payment to Mr. Souris is found in his agreement with the corporation, which existed long before the events with which we are concerned here. We conclude that the payment from the corporation to Mr. Souris is deductible by the corporation as reasonable compensation under section 162(a)(1).

---

Finally, a word about "employer reversion", which is defined in section 4980(c)(2), and which is treated by both parties as applicable here in connection with whether the employer reversion is includable in the gross income of the employer for purposes of the income tax. However, section 4980 literally relates solely to an excise tax. Subsection (a) of section 4980 now imposes "a tax of 20 percent of the amount of any employer reversion from a qualified plan." And in defining the term "employer reversion" subsection (c) begins with the words "For purposes of this section". Yet, as just indicated, both parties in this case treat the section 4980(c)(2) definition as applicable here for purposes of the income tax. Indeed this Court has so indicated. Lee Engineering Supply Co. v. Commissioner, 101 T.C. 189, 194 (1993); cf. S. Rept. 1567, 75th Cong. 3d Sess. at 24 (1938), 1939-1 C.B. (Part 2) 779, 796.

Section 4980 was introduced into the Code by section 1132(a) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2478. The excise tax there enacted was at the rate of 10 percent, which has since been increased to 15 percent[5] and then finally to 20 percent.[6] The reason for imposing that excise tax has been explained as follows:

> To the extent that amounts in such plans are not used for retirement purposes and revert to an employer, Congress believed that the tax treatment of reversions should recognize that the tax on earnings on pension funds is deferred and, thus, the benefits of this tax treatment should be recaptured. Although Congress believed that it might be possible to determine the particular year or years in which contributions resulting in a reversion arose and to recoup the resulting tax benefit attributable to a reversion on that basis, Congress was concerned that such a computation would involve undue complexity. Under the circumstances, therefore, Congress determined that a nondeductible excise tax should be imposed on reversions at a uniform rate. [Staff of Joint Comm. on Taxation, General Explanation of the Tax Reform Act of 1986 at 751 (J. Comm. Print 1987)]

The record in this case does not disclose whether any such excise was proposed or assessed against petitioner corporation here. And it has been indicated that the imposition of the excise tax on the employer reversion does not preclude the inclusion of the employer reversion in the employer's gross

---

[5] The amendment was adopted in 1988. See Technical and Miscellaneous Revenue Act of 1988, Pub. L. 100-647, 102 Stat. 3704.

[6] Sec. 4980 was amended in 1990 to 20 percent. See Omnibus Budget Reconciliation Act of 1990, Pub. L. 101-508, sec. 12001, 104 Stat. 1388-562.

income for income tax purposes as well.  Indeed, in H. Rept. 101-881, 51 (1990) it is stated that "assets that revert to the employer upon such termination are includible in the gross income of the employer <u>and</u> are subject to an excise tax (sec. 4980 of the Code)."  (Emphasis added.)  Certainly, it would seem highly unlikely that Congress could have intended a mere 10 percent excise tax to replace the tax on income at a substantially higher rate, and there is nothing in the legislative history relating to the increase in the excise rate from 10 to 15 and then to 20 percent to suggest that the intention of Congress changed.

We express no opinion here as to petitioner corporation's liability for the excise.  And since we have concluded that there is no deficiency in income tax, we need not consider whether there is any liability for the section 6661(a) addition to tax.

<u>Decision will be entered</u>

<u>for petitioner</u>.